**ENVIRONMENTAL LAW FUND, a corporation, et al., Plaintiffs,**

v.

**John A. VOLPE, as Secretary of the United States Department of Transportation, et al., Defendants.**

**No. C–72–95.**

United States District Court,
N. D. California.
March 22, 1972.

---

1. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947).

Ferguson & Capron, and Public Advocates, Inc., San Francisco, Cal., for plaintiffs.

Norval Fairman, Donald Velasco, Robert R. Buell for California Department of Public Works and various State de-

**1330**

fendants. James L. Browning, Jr., U. S. Atty., Paul Locke, Asst. U. S. Atty., San Francisco, California, for Federal defendants.

MEMORANDUM
and
ORDER

PECKHAM, District Judge.

Plaintiffs herein seek to enjoin construction of a Route 101 by-pass near Novato, California. The present Route 101 runs the length of the State of California and passes through the business section of Novato, where the traffic encounters low speed limits, three traffic signals, and congested conditions. Defendants have filed affidavits showing that a highway by-pass has been planned for over ten years, but various political misgivings about the exact route have prevented construction from taking place sooner. The project received location approval on March 2, 1967, and design approval on December 12, 1968.[1] Subsequent to the latter date there were minor changes in design involving a fence and the closing of a side street, but the court finds that design approval as described in the Depart-

ment of Transportation regulations was granted on December 2, 1968.

Plaintiffs have moved for an injunction pending appeal and for reconsideration of the court's denial of their motion for a preliminary injunction. The basis of their motion for a preliminary injunction was the state defendants' failure to file, and the federal defendants' failure to require, an environmental impact statement, as described in Section 102(2) (C) of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (NEPA).[2] The Act was passed by the United States Senate on December 20, 1969, and then became effective on January 1, 1970. The problem in the instant case concerns the significance of the date January 1, 1970. Defendants contend that no environmental impact statement is required for projects receiving design approval before January 1, 1970. Plaintiffs, on the other hand, seem to contend that if any harm to the environment is likely to take place, an environmental impact statement *must* be filed. The basic question in this case is the extent to which NEPA applies to an ongoing project.

The National Environmental Policy Act is a legislative expression of the

---

1. For an explanation of the complicated stages of highway development, see 23 U.S.C. § 101 et seq. and PPM 90–1.

2. Section 102 reads as follows:
 The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall . . .
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,

 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

deep significance this society attaches to the preservation of the environment. Congress believed that for too many years environmental considerations had been ignored while federal projects blindly forged ahead, cutting through parks, streams, and forests, increasing various forms of pollution, destroying environmental resources, and, in many cases, upsetting the ever-delicate ecological balance in a geographic area. Congress responded to what many have characterized as an intensive and long-term ravaging of the environment with the NEPA. Though in the past Congress had enacted many bills directed towards environmental protection, the NEPA clearly represents the strongest legislative policy statement in this area. For example, the Act compels government agencies to take environmental considerations into account and to give them significant weight in the balancing of factors.[3] In light of this strong statement of policy, courts have been most active in assuring that the environment receives adequate protection.

The main foil of the NEPA policies is the Section 102(2)(C) requirement of impact statements. Congress recognized that without detailed studies it would be most difficult to identify and to evaluate the environmental ramifications of a project, particularly where the ecological balance may be affected. Section 102(2)(C) was enacted to force Government agencies to investigate and to consider these environmental ramifications, be they apparent or covert. Each agency hopefully will now have before it all the necessary data to adequately consider the harm to the environment.

The stated effective date of the statute, and more particularly Section 102 (2) (C), is January 1, 1970. It is most difficult to place a practical meaning on this statement, as most projects that are "major federal actions" are not constructed over night. Most highway proj-

ects, for example, take six to eight years from the time that location approval is sought until construction is completed. Many federal actions were in some stage of development—whether planning or construction—when the NEPA was passed, and a volatile dispute in the law has emerged on the extent to which NEPA, and particularly Section 102(2) (C), applies to an ongoing project. See, e. g., Brooks v. Volpe, 319 F.Supp. 90 (W.D.Wash.1970), motion for re-hearing denied, 329 F.Supp. 118 (1971), rev. on other grounds, 460 F.2d 1193 (9th Cir., 1972); Calvert Cliffs, Coordinating Committee, Inc. v. United States Atomic Energy Commission, 449 F.2d 1109 (D. C. Cir. 1971); Morningside-Lenox Park Association v. Volpe, 334 F.Supp. 132 (N.D.Ga.1971); Nolop v. Volpe, 333 F. Supp. 1364 (D.S.Dak.1971); Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238 (M.D.Pa.1970).

The Council on Environmental Quality addressed this problem in its guidelines to other governmental agencies:

11. Application of Section 102(2) (c) procedure to existing projects and programs. To the maximum extent practicable the Section 102(2) (c) procedure should be applied to further major federal actions having a significant effect upon the environment even though they arise from projects or programs initiated prior to the enactment of the Act on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further incremental federal actions be shaped so as to minimize adverse environmental consequences. It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program.

The CEQ Guidelines make a clear distinction between projects initiated *before* January 1, 1970 and projects

3. For a comprehensive, general discussion of the background and scope of NEPA, see Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 449 F.2d 1109 (D.C.Cir. 1971).

initiated *after* January 1, 1970.[4] For the latter an environmental impact statement is required "to the fullest extent possible" but for the former a statement is required only "to the maximum extent *practicable*". This distinction is in concert with the legislative history and the general principles against retroactive application of statutes.[5] Plaintiffs contend that the NEPA should apply in toto to ongoing projects but fail to cite any persuasive authority that this was the intent of Congress.[6] The court agrees with the reasoning in Elliot v. Volpe, 328 F.Supp. 831 (D.Mass.1971) that one must distinguish between projects initiated before January 1, 1970 and projects initiated after January 1, 1970.

The CEQ Guidelines, however, do not explain how the criterion of "to the maximum extent practicable" applies to federal actions, and particularly to highway projects. The Department of Transportation has the responsibility of setting out detailed guidelines for the state highway departments and for the courts on this problem, but Policy and Procedure Memorandum 90–1 offers little assistance in this matter.[7] Consequently, the court must determine its own standards of practicability.

■ The first matter to consider is the *most appropriate time* for filing the environmental impact statement. Ideally, one would prefer the environmental considerations to be taken into account at the planning stage. In the case of federal-aid highways, this would be prior to design approval.[8] The United States Court of Appeals for the Third Circuit addressed itself to the importance of design approval in the case of Wildlife Preserves, Inc. v. Volpe, 443 F.2d 1273 (3rd Cir. 1971). Although that case concerned § 4(f) statements rather than NEPA statements,[9] the reasoning

---

4. "Initiated" must be taken to mean some significant federal participation in the project. For highway projects, a project is "initiated" when it receives location approval. See La Raza Unida v. Volpe, 337 F.Supp. 221 (N.D.Cal.1971); and Lathan v. Volpe, 455 F.2d 1111 (9th Cir.1971).

5. Plaintiffs argue that they do not seek retroactive application of the NEPA but rather seek to prevent any future harm to the environment. The court believes it unnecessary to engage in a semantic debate, except to point out that plaintiffs are requesting the court to force the state highway department to *re-plan* the project. Whether or not one believes this is "retroactivity" is not crucial; the point is that plaintiffs seek to apply a statute to an ongoing project, after a certain planning stage has passed. On this point, see the discussion below at page 3259.

6. Plaintiffs cite a rather unpersuasive law review note on this point, Retroactive Application of the NEPA, 69 Mich.L.Rev. 732 (1971).

7. The Federal Highway Administration Guidelines implementing NEPA do require the state highway departments to re-evaluate certain projects "to determine if such projects were developed in a manner as to minimize adverse environmental consequences." However, no environmental statement need be submitted unless requested by the division engineer.

On April 16, 1971 defendant Donald E. Trull, the local Federal Division Engineer for the Department of Transportation, concurred in a statement that the "project has been developed in such a manner as to give detailed consideration to the potential impact upon the quality of human environment and that modifications to the project and an Environmental Statement are not required". One must assume that Mr. Trull, by his concurrence, was stating that an environmental impact statement was not "practicable"; however, the court is unaware of the criteria and factors Mr. Trull utilized in arriving at his decision.

8. Paragraph 10 of PPM 20–8 gives an elaborate description of what is to take place before design approval. For example, each state highway department must include a study report containing "descriptions of other alternatives considered and a discussion of the anticipated social, economic, and environmental effects of the alternatives, pointing out the significant differences and the reasons supporting the proposed location or design. In addition, the report must include an analysis of the relative consistency of the alternatives with the goals and objectives of any urban plan that has been adopted by the community concerned."

9. See 49 U.S.C. § 1653(f).

on the importance of design approval is still applicable. The court in *Wildlife Preserves* held that design approval is the crucial planning stage for a highway project. All the planning, and all the environmental, economic, and social factors should be taken into account at this stage.[10] In other words, if an environmental impact statement is to be filed, it should be filed prior to design approval, when all the planning has been done.

■ ■ Thus, even if a project were initiated prior to January 1, 1970, if the planning phase of the project did not take place until after January 1, 1970, a NEPA statement is required. No balancing of factors can be permitted in such a case;[11] the state highway department *must* file a statement in compliance with Section 102(2) (C).[12] However, if all the planning for a project took place *prior* to January 1, 1970— that is, if design approval preceded the passage of NEPA—a Section 102(2) (C) statement is required only if "practicable". The specific further criteria of practicability will be discussed be-

low, but the court first desires to emphasize the significance of design approval.

The court is aware that some courts have held, in effect, that no environmental impact statement is required *at all* if design approval took place prior to January 1, 1970. See Investment Syndicates, Inc. v. Richmond, 318 F.Supp. 1038 (D.Or.1970); Brooks v. Volpe, 319 F.Supp. 90 (W.D.Wash.1970), motion for re-hearing denied, 329 F.Supp. 118 (1971), reversed on other grounds, 460 F.2d 1193 (9th Cir., 1972);[13] Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238 (M.D.Pa.1970). The court respectfully declines to follow these cases, as it believes these courts have not weighed sufficiently the strong federal policies protecting the environment. The National Environmental Policy Act and the legislative discussions preceding the passage of the Act demonstrate rather persuasively that Congress places an immense value on the preservation and protection of the environment. One would have to ignore the strength of these policy statements to assert that severe environmental or ecological harm can be permitted simply because all plan-

---

10. See also Policy and Procedure Memorandum 20–8.

11. On this point, see also Lathan v. Volpe, *supra*, and La Raza Unida v. Volpe, *supra*.

12. Although the project in question received design approval *before* January 1, 1970, the court must consider projects that received design approval *subsequent* to that date in order to develop an overall analysis to the instant problem. The court recognizes that the analytical framework it is using—namely, that a NEPA statement is required for all major federal projects planned after January 1, 1970 —may be inconsistent with certain language in paragraphs 5b and 5c of PPM 90–1. The possible areas of inconsistency involve only those major federal projects that received design approval after January 1, 1970 and before February 1, 1971; the court believes that the regulations effectively implement the CEQ Guidelines for all projects receiving design approval after February 1, 1971. Since the project in question does not fall within the area of the possible inconsistency, the court will not discuss the possible discrepancy at length. Rather, it is sufficient to point

out that an inconsistency *may* exist for certain projects as to how the regulations would approach the problem of requiring an environmental impact statement, and how the court would approach the same problem for these projects.

13. On March 2, 1972 a Ninth Circuit panel reversed the lower court in Brooks v. Volpe; however, the exact ground of reversal, in so far as the present case is concerned, is unclear. In *Brooks*, the appellate panel concluded that the holding in Lathan v. Volpe was controlling. Since the so-called retroactivity question was not discussed at all in *Lathan*, one must assume that the appellate court in *Brooks* did not pass judgment on that issue. Given that a) the project in *Brooks* had not received design approval prior to the court's decision; b) the appellate panel in *Brooks* considered the Washington project to be "a nearby segment of the same highway [as in *Lathan*]"; and c) the panel stated that the holding in *Lathan* was controlling, there is no reason to conclude that the appellate decision in *Brooks* has any bearing on the problem presently before this court.

ning had been completed before January 1, 1970. An environmental impact statement is still required if practicable.

On the other hand, the Act and the CEQ Guidelines clearly distinguish between projects initiated prior to January 1, 1970 and projects initiated after that date. Obviously, if the planning phase has not been completed, it is still practicable to file a statement. But plaintiffs urge this court to go further, to the point where an environmental impact statement should be required for *all* projects from which some deleterious effect to the environment may occur, even if the planning stage has been completed. In other words, plaintiffs believe that for most federal projects it is "practicable" to file a statement as long as construction did not commence prior to January 1, 1970.[14] Not only does the court find the commencing of construction an arbitrary cut-off point, but plaintiffs' position ignores the distinction made in the Act itself and in the CEQ Guidelines.[15]

■ The major question that remains, then, is when is it "practicable" for a state highway department to "re-plan" a highway project that received design approval before January 1, 1970. As was stated above, there is little guidance for deciding when it is practicable to require a statement, and the court is forced to develop its own standards. The court believes that four major factors should be taken into account in determining the practicability of requiring a NEPA statement after a project has passed the planning stage:

1. The participation of the local community in the planning of a project.

Community participation in the decision-making process is most important. Indeed, it is questionable if environmental (as well as social or economic) factors can be taken into account in any meaningful manner without community participation in the decision. The residents of the local community are the ones who must live with and tolerate a highway, a high-rise, a dam, or any other "major federal action". In regard to highway projects, PPM 20–8 clearly acknowledges the importance of public hearings and local participation in the decision-making process.[16]

14. This was the position adopted by plaintiffs' attorneys at the oral hearing on the motion for reconsideration.

15. Plaintiffs point to several cases to support their position here, but only two need be mentioned. The case plaintiffs rest upon most heavily, Morningside-Lenox Park Association v. Volpe, 334 F.Supp. 132 (N.D.Ga., 1971), has inconsistent language on this point. On the one hand the court states "Indeed, the Court deems this location or design 'approval event' to be clearly the most appropriate time for the consideration of these [environmental] values. The wisdom of designating one approval date as the 'major federal action' date for purposes of NEPA applicability is made evident by the facts and decision in the [Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept., 5 Cir., 446 F.2d 1013] *San Antonio* case."

Later in the opinion, however, there is the following language: "In short, the court holds that compliance with Section 102 of the NEPA is required as to an ongoing federal project on which substantial actions are yet to be taken, regard-

less of the date of 'critical' federal approval of the project." It would seem that the first statement requires an opposite, or at least a qualified, conclusion in the second statement. There is no attempt to explain why a statement is required once the "most appropriate time" for considering these values has passed.

Nolop v. Volpe, 333 F.Supp. 1364 (D.C. S.D.1971) is distinguishable in that the highway project in dispute received both location and design approval *after* January 1, 1970. However, in dicta the court indicates that *even if* design approval had taken place before NEPA was passed, a 102(2) (C) statement would be required. The court in *Nolop* makes no attempt to define "practicability" or to limit the effect of what it calls the "retroactive application" of NEPA. This court simply comes to a different conclusion after consulting the regulations and the legislative history.

16. See also 23 U.S.C. § 128. Obviously, if the public hearings were not in compliance with the requirements of PPM 20–8 or 23 U.S.C. § 128, an environmental impact statement is required, as the location or

2. The extent to which the state department involved has attempted to take environmental factors into account in regard to a particular project.

If, at the planning stage, the state has not attempted to take into account possible environmental ramifications, it may in effect have frustrated strong federal policies against harming the environment. It does not seem burdensome to ask the state to attempt to consider the risks and harms from a project. If the decision-makers have made little or no attempt to take into account environmental factors, an environmental impact statement is most likely "practicable".

3. The likely harm to the environment if the project is constructed as planned.

Obviously, it is difficult to assess accurately the exact harm to the environment without a comprehensive impact statement; indeed, that is the purpose of Section 102(2) (C). If, however, a plaintiff can show that significant damage to the environment may take place, an environmental impact statement may be quite "practicable". The court would point out that the opportunity to utilize this factor rests almost entirely with the plaintiff; that is to say, this factor does not deserve much weight in the balance unless a plaintiff can establish that some environmental harm is likely to take place.[17]

4. The cost to the state of halting construction while it compiles an environmental impact statement.

The practicability of an impact statement must depend, to a large extent, on the cost to the state of halting construction on the project. For example, if a state can show that suspending work on the project will impose a significant cost, then the plaintiffs must demonstrate rather strongly through the other three factors mentioned above why a statement is still practicable.

■ It is important to note that under the proposed test, the stage of progress of a particular project is significant only to the extent that the state will suffer some economic harm if work is halted while it gathers data on the environmental ramifications. Under the proposed balancing of factors approach, the court would halt a project presently under construction if the cost to the state would be outweighed by the possible harm to the environment, and/or if the plaintiffs could demonstrate that the state made little or no effort to take environmental factors into account, and/or if local participation in the decision-making process had been minimal.[18]

■ Applying the proposed test for practicability to the facts of the instant case, one sees that the balance of factors rests with the state.

*Factor 1:* the participation of the local community in the planning of the project.

Defendants have submitted numerous exhibits and affidavits which show that the community in Novato was extremely

---

design approval were "defective". There also may be some situations, however, when the statute or regulations were complied with and a court nevertheless may believe that the local residents had an inadequate opportunity to express their views. In those situations, a court still might require a NEPA statement.

17. It should be apparent that without a Section 102(2) (C) statement a state cannot say with any real assurance that very little harm to the environment is likely to take place.

18. Thus, under the test presented here the court would agree, for example, with the result reached in Environmental Defense Fund, Inc. v. Corps of Engineers, 324 F. Supp. 878 (D.D.C.1971) and Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 728 (D.D.Ark. 1971) [the former case involved the Cross-Florida Barge Canal and the latter involved the Cossatot River Dam].

active in the planning and development of the proposed highway. See Defendants' Exhibits H, I, and J, and Affidavit of Leo J. Trombatore. Indeed, the strong, active campaign of the newspapers has fostered a vigorous debate within the community on the pluses and minuses of various aspects of the proposed highway. While the extensive discussions have no doubt delayed the development of the project, the Novato Advance and various citizens groups involved must be commended for their efforts to inform the community and to assure that factors normally swept under the rug would be taken into account.

*Factor 2:* the extent to which the state has attempted to take environmental factors into account.

The state highway department definitely has attempted to take environmental factors into account. On March 30, 1971 the California Highway Department submitted an environmental fact sheet which, although not nearly elaborate enough to pass as a satisfactory 102(2) (C) statement, nevertheless does show that the state has attempted to take environmental factors into account. Defendants' Exhibit C. Moreover, as part of the process of applying for a permit from the Coast Guard to bridge Novato Creek, a 102(2) (C) statement for this portion of the highway was furnished to the Coast Guard. Subsequently, the state obtained from the Coast Guard a permit to bridge Novato Creek. (See Defendants' Exhibit E.)

*Factor 3:* the likely harm to the environment if the project is constructed as planned.

Unlike the situation in *La Raza Unida,* *supra,* or the *Army Corps of Engineers* (Florida) case, *supra,* this is not a situation where parklands will be destroyed or a delicate ecological balance will be drastically affected. The only possible harm to the environment alleged by plaintiffs is the supposed danger from excavation with the "waste and borrow" method of highway construction. See the two affidavits of Jerry A. Cannon, and affidavits of Arthur T. Knutson and Keith H. Bergman. Plaintiffs have conceded that their grievance is with the *method of construction,* not with the *route* of the proposed project. These affiants assert that alternative methods exist which may be less harmful to the environment. These assertions—and, to repeat, these are the *only* allegations of harm to the environment—are challenged by the affidavit of a state highway engineer, Mr. W. J. Zenoni, dated January 25, 1972. Mr. Zenoni asserts that the alternatives suggested by plaintiffs' affiants were considered and rejected as either too expensive [19] or structurally unsound. Nevertheless, in this part of the balancing test we must assume that some harm to the environment will take place, in the form of massive excavation.[20]

*Factor 4:* the cost to the state of halting construction while it compiles an environmental impact statement.

If an injunction were granted until the state compiles an environmental impact statement, there is a significant chance the state will suffer a severe economic loss. On oral argument, and with a supporting affidavit, counsel for the state defendants represented to the court that if an injunction were to issue, the state "very likely" would lose approximately $10.8 million in federal highway funds. Moreover, the state will be liable to various contractors for any loss the latter suffer as a result of the delay.[21]

---

19. The causeway alternative would increase the cost of the highway from $14.6 million under the present proposal to approximately $28 million with the causeway.

20. This harm, of course, must be compared with the harm to the environment from implementing the alternative proposals.

21. Plaintiffs asserted on oral argument that the state opened itself to some financial risk by holding the bidding as scheduled on February 8 and then awarding the contracts within a short period thereafter. It should be noted, however, that plaintiffs did not file their complaint until three weeks before the bids were

An over-view of the four factors taken collectively reveals that an environmental impact statement is simply not "practicable" at this time. The community has participated actively in the decision-making process; the state has made significant efforts to take environmental ramifications into account; and any alleged harm to the environment would seem to be outweighed by the cost to the state if an injunction were to issue. Consequently, the motion for a preliminary injunction and the motion for reconsideration must be denied.

This is not to say that in most highway cases where design approval was received before January 1, 1970 an environmental impact statement would not be required. Indeed, the court can envision many situations where a 102(2)(C) statement would be required even though design approval took place prior to January 1, 1970. For example, if a plaintiff could establish that the local community did not have an adequate opportunity to participate in the decision-making process; or that the state had ignored or not sufficiently considered the environmental ramifications of the project; or that the harm to the environment would be severe; or that the state would not incur a high cost if the highway project were enjoined, then an injunction should issue and the state should be required to submit an environmental impact statement. The situation presently before the court is simply not such a case.

Finally, under the test set forth in Schwartz v. Covington, 341 F.2d 537 (9th Cir. 1965), the motion for a stay pending appeal must be denied.

to be opened. While the court does not believe it should invoke the doctrine of laches, as defendants urge it to do, the court nevertheless is mindful that plaintiffs' delay in filing the complaint has contributed to the pressure of the present situation.