The **CONSERVATION SOCIETY OF SOUTHERN VERMONT, INC., et al.**

v.

**John A. VOLPE, Secretary of Transportation, et al.**

**Civ. A. No. 6598.**

United States District Court,
D. Vermont.

June 2, 1972.

Williams, Witten & Carter, Bennington, Vt. (Harvey D. Carter, Jr., and Jeffrey E. Silver, Bennington, Vt., on the brief), for plaintiffs.

Norman Cohen, Asst. U. S. Atty., Rutland, Vt., Andrew J. Dilk, U. S. Dept. of Transp., Washington, D. C. and Fletcher Krause, Regional Counsel, U. S. Dept. of Transp., Delmar, N. Y., for defendants Volpe and Kelley.

Richard M. Finn and Robert Schwartz, Asst. Attys. Gen., State of Vermont, Montpelier, Vt., for all remaining defendants.

### FINDINGS OF FACT, OPINION AND ORDER

OAKES, Circuit Judge (Sitting by Designation).

The above matter came on for hearing on May 22, 24 and 25 on plaintiffs' application for preliminary injunctive relief. By consent of the parties and order of the court, pursuant to Fed.R.Civ. P. 65, the hearing was transposed into one on the merits, i. e., plaintiffs' application for permanent injunctive relief. Defendants waived any objection to

plaintiffs' standing to sue, Scenic Hudson Preservation Conference v. FPC(I), 354 F.2d 608 (2 Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966), except as to plaintiff The Vermont Association of Railway Passengers, and the court finds that the individual plaintiffs, as residents and citizens of Bennington County, Vermont, as well as plaintiff The Conservation Society of Southern Vermont, Inc. ("The Society"), of which they are members, have the requisite personal interest or stake in the outcome of this litigation under Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (Apr. 19, 1972), to maintain it. No showing having been made as to any standing of The Vermont Association of Railway Passengers, the complaint is dismissed as to it. Plaintiffs called four witnesses, defendant State of Vermont three, and defendant Volpe one. The court has considered all documentary and photographic proof offered, and makes the following findings of fact.

## FINDINGS OF FACT

1. Bennington County, Vermont, is located in the southwest portion of the state and is a county of great scenic beauty, consisting of valleys, hills, glacially formed mountains (Taconic and Green), forest areas, some remaining pastoral scenery located primarily in the valleys, village and small towns, along with the larger towns, which are also highway crossroads, of Bennington and Manchester, Vermont, the former known for its college and varied residential-commercial and industrial economy, the latter known primarily as a winter-summer recreation area with four-season homes nearby.

2. Bisecting Bennington County, primarily running through the valley floors between the north-south range of Green Mountains and the more or less parallel north-south range of Taconic Mountains to the west, is U.S. Route 7, a major highway that runs through western Connecticut and Massachusetts, through Bennington County to Vermont's two major cities, Rutland and Burlington, and thence to the Canadian border where it leads to Montreal. Over 90 per cent of the County's population is in the towns through which Route 7 passes (Gov.Ex. 4, p. 4), but the highway itself is especially scenic since the principal valley land which it traverses is only 3 to 6 miles wide and the parallel mountain ranges that border it rise abruptly 2,000 feet or more in altitude from the valley floor. It is truly an area with the stuff of which poetry is made; one of Robert Frost's five Vermont farms lay there.

3. The average daily flow of traffic on Route 7 as of 1968 varied from 3,500 to 4,500 vehicles, rising to more than 13,000 per day (one of the highest in the State of Vermont) in the busy commercial center immediately to the north of Bennington Village. The design of Route 7 is obsolete for much of its length, in view of present day traffic patterns and volumes, being winding, narrow, hilly, with short sighting distances, relatively sharp curves, limited to two lanes, and presenting hazards to the traveling public as well as the local populace. It has, however, been improved in certain stretches, particularly in that part of the County north of Manchester.

4. Improvement of Route 7 has been talked about for at least 15 years, has been in various stages of highway thinking, planning and design for 8–10 years, has been in part the subject of a legislative mandate for construction since 1966, and is necessary not only to highway safety but also to the long-range planning needs of the County, as set forth in the Regional Plan, Bennington County Vermont Regional Planning Commission (1970) (Gov.Ex. 4).

5. "Design approval" as a term in highway thinking is new, originating after enactment of the National Environmental Policy Act (NEPA) and Department of Transportation regulations adopted, if not in accordance therewith, in accommodation thereof. "Design approval" is a term of art, so to speak, in

that prior to the adoption of those regulations there was no formal step or procedure whereby the federal government, acting through the now defunct (if not extinct) Bureau of Public Roads, gave its "approval" to the "design" of any highway. The court finds, nevertheless, that, as explained in the testimony and particularly in Government Ex. 6, by Albert R. Purchase, longtime Division Engineer for the Bureau and the Federal Highway Administration (FHWA), design approval within the meaning of PPM 90–1 (DOT–Fed. Highway Adm'n) transmitted under date of August 24, 1971, Para. 5(e), was had for the following Route 7 projects as of July 17, 1968:

F 019–1(6); F 219–1(7); F 019–1(8); AP 019–1( ), F 110–1( ), AP 019–1( ); F 019–1(9) (except for the northerly 1.47 miles thereof, as to which there was no design approval until January 26, 1971.

The court limits this finding to the proposition that in substance the overall route, line, or general location was submitted by the state highway department to the federal agency and received substantial acceptance therefrom subject to minor refinements of line and such lesser changes as might be made in the course of survey, design and right of way acquisition. This finding is made by a court bearing in mind that so-called Section 222 hearings (19 V.S.A. § 222) were not held by the State until later and that so-called "design hearings" (a creature of PPM 20–8) were not held until after such "approval" had been granted, the "hearings" being intended to comply with an entirely new federal regulation or set of regulations (contained in PPM 20–8, issued on or about January 14, 1969, under the Federal-Aid Highway Act and the Department of Transportation Act). "Design approval" in this narrow and limited sense means general approval of an overall line, and is subject to specific engineering changes resulting from the preliminary survey and objections voiced by communities and landowners affected by the proposed route, as well as by ecologists.

6. No design approval in any sense of the term was had for the following projects until January 21, 1971: AP 219–1( ), F 110–1( ), AP 219–1( ), the southerly half of the so-called Bennington Belt-Line; and until January 26, 1971, the northerly 1.47 miles of Project F 019–1(9) leading easterly of the village of Manchester. No such approval has been had for any other Route 7 improvements other than those already construction-complete.

7. So-called Arterial 7, consisting of Projects F 019–1(6) and F 219–1(7), and meeting the highest traffic-flow requirements of the area (see Finding No. 3 above), is independent of and unrelated to the other projects in question; the construction of Arterial 7 is at a further stage of progress than any of the other projects; completion of Arterial 7, consisting mainly of re-routing and improving the traffic through and to the immediate north and south of Bennington Village will not require or affect the planning or construction of any other portion of Route 7; and such completion is necessary at the earliest possible moment both from a traffic and a cost standpoint. There are no foreseeable substantial adverse ecological or environmental effects of construction, were continuation of pending plans and completion of construction of Arterial 7 as above defined to occur.

8. Despite "design approvals" on July 17, 1968, of Projects F 019–1(8) and (9), and on January 21, 1971, of Projects AP 219–1( ), F 110–1( ), AP 219–1( ) and January 26, 1971, of Project F 019–1(9)'s northerly 1.47 miles, there are substantial ecological and environmental effects that may occur if the present highway design of these projects is pushed to completion, that have not been adequately considered by the federal and state highway engineers and that may, with relative ease of design and right of way acquisition, be avoided in any future construction. These effects

—cognizable even from only a limited exploration of the area by the plaintiffs' expert ecologists—indicate that a review of environmental effects along this major portion of the proposed relocation of Route 7 is required to avoid upsetting ecological balances and to avoid the destruction of invaluable environmental resources. Any delay occasioned by such a revaluation—estimated by government witnesses to take one year—will cost the defendants little or nothing because design and acquisition of these portions of the highway have not reached a stage where bids are ready to be let, and may indeed preserve ecological values which will be cherished by succeeding generations although they may seem to some to be of little or no meaning now.

9. Specifically included in the adverse effects that may occur are those (1) to Jewett's Brook and its wetlands and marsh, which have botanical significance and require soil stabilization (avoidance of siltation and sedimentation together with preservation of the quality of run-off), and which attract significant and rare birdlife; (2) to Harrington's Cobble, an abruptly rising limestone hillock with a peculiar profusion of herbs and wildflowers, unique in Bennington County; and (3) to a portion of the Chiselville beaver pond with adjacent marshes containing a botanically unique juxtaposition of wetland softwoods and hardwoods, with concomitant aquatic vegetation. Upon a re-survey of the ecological effects of these proposed highway projects other similarly significant wilderness or semi-wilderness areas may be uncovered with substantially equivalent long-range significance extending well beyond the short-term highway use to which defendants intend to appropriate them.

10. There has been a degree of "community involvement" in connection with the proposed highway changes, but—on the somewhat scanty record before the court in this respect—the communities, as exemplified by Government Ex. 2, have been more concerned with local socio-economic and short-range effects of highway improvement, rightfully including increased highway safety, to be sure, than with the long-range preservation of the environment. This environment helps to make Bennington County, and the state in which it is situated, an example which the rest of the United States would be fortunate to be able to emulate.

11. The state highway department has, before any National Environmental Policy Act, valiantly attempted in the past few years—in which there has been a rapidly expanding public consciousness of environmental impact—to examine the environmental effects of proposed highways. This concern, genuine if belated, has manifested itself by, for example, calling in Dr. Frederick Mould, an acknowledged wetlands expert, to advise on the Jewett's Brook marsh here involved, and following his advice to the extent of moving the proposed line easterly—all of this only after the department's attention was called to this by plaintiff's counsel. At the hearing the concern manifested itself further in the testimony of one of the state engineers who indicated that, by "squeezing" the median strip of what ultimately is apparently planned as a four-lane highway, any major damage to Harrington's Cobble might be avoided within the limits of the present design and right-of-way acquisitions now in process. Like that of other departments, state and federal, the environmental attention now being paid by the Vermont state highway department may be both too little and too late, but not so little or so late that a thorough review of environmental impact, followed by what probably are simple design-engineering changes, will still be sufficient to save the day.

CONCLUSIONS OF LAW

■ This court rejects the broad view of plaintiffs that the National Environmental Policy Act (NEPA), 42 U. S.C. § 4332(2) (C), requires an impact statement where any highway project was incomplete as of January 1, 1970, the effective date of NEPA, as well as the

narrow view of defendants that no NEPA statement is required if there were "design approval" of a given highway project before the date of February 1, 1971 (the time which DOT apparently thought a reasonable one for the implementation of NEPA, as per PPM 90–1 § 5), or at least before the January 1, 1970, effective date of the governing act. In so holding, the court has considered the leading cases, Hanly v. Mitchell, 460 F.2d 640 (2d Cir., May 17, 1972); Greene County Planning Board v. FPC, 455 F.2d 412 (2d Cir. 1972); and Calvert Cliffs' Coordinating Committee v. AEC, 449 F.2d 1109 (D.C.Cir.1971). The court bears in mind and agrees with the conclusion of Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013 (5th Cir. 1971), that highways may not be broken into such short segments that the public is effectively left without remedy in the event that two non-adjoining segments are approved. This rule of law is found inapplicable, however, to Arterial 7, as defined in the findings, since that portion of defendants' proposals is entirely independent of the remainder of them. In rejecting defendants' narrow view of the law the court has in mind the decision in Arlington Coalition of Transportation v. Volpe, 458 F.2d 1323 (4th Cir., Apr. 4, 1972), holding that "design approval" is not determinative but that the key question in respect to highway NEPA statements is whether the highway "has reached the crucial stage . . . ." Parenthetically, we note that NEPA is not the sole federal act involved; compliance with section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f), and with section 138 of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138, is also required, and the court's references to conformance with NEPA requirements are not intended to by-pass the other applicable statutes.

In rejecting plaintiffs' broader view, however, the court has in mind the decisions of the Third Circuit in Con-cerned Citizens of Marlboro v. Volpe, 459 F.2d 332 (Apr. 28, 1972), and Pennsylvania Environmental Council v. Bartlett, 454 F.2d 613 (3rd Cir. 1971), holding that "design approval" together with federal commitment of funds before January 1, 1970, makes NEPA inapplicable to highway projects. The views of the Third Circuit on the one hand and the Fourth Circuit on the other are not necessarily irreconcilable, however, insofar as the projects in this case are concerned. The better view, which this court adopts as its own, seems to be that taken impliedly by the Second Circuit in Hanly v. Mitchell, *supra*, and expressed explicitly by District Judge Peckham in Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Cal., Mar. 22, 1972). He held that in determining the applicability of NEPA to projects pending as of January 1, 1970, the test is that suggested by the Council on Environmental Quality in its guidelines to other federal agencies, viz., to apply NEPA, or more particularly its section 102(2) (C) [42 U.S.C. § 4332(2) (C)] requirement of an "impact statement," to pending projects "to the maximum extent practicable." This in turn requires the court in each instance to balance appropriate factors, including but not limited to (1) community participation in the decision-making process (we have seen how this is relatively unimportant in this instance); (2) the extent to which the state agency has taken environmental factors into account (it is easier to find inadequacies by hindsight, especially when the public concept of what constitutes ecological value has been changing as rapidly as it has in the past decade); (3) the substantiality and likelihood of harm to the environment if the project is constructed as planned; and (4) the cost to the state measured in terms of dollars and to the public in terms of safety if substantial delay in completion of the project occurs. This view of the law *assumes* of course that impact statements will be required as to any project such as the Beltline here [AP 219–1( ), F 110–1( ), AP 219–1( )], which affects Jewett's Brook and

its marshes but the design of which was not approved until *after* the effective date of NEPA. In other words, this court rejects out of hand the attempt of DOT to extend the effective date of NEPA by regulation (PPM 90–1) to February 1, 1971. The attempt has support neither in the Act itself nor in administrative necessity. The fact that there were thousands of on-going highway projects on the effective date of NEPA does not make the Act less effective. We thus weigh the other projects in the scales established, however crude they may be.

 It follows from the findings in respect to the Arterial 7 project—its independence from other projects, its traffic importance, and the lack of any showing of even trivial environmental significance—that it may proceed to completion under the tests above enunciated. On part of this improvement bids have been opened and must be accepted or expire before June 5, 1972; on another part they are ready to be let.

 It equally follows as to that part of the affected projects north of Arterial 7 and extending northerly from just south of the Bennington line almost to Manchester that if there has been any substantial showing of potential serious environmental harm, an impact statement must be filed, at least where, as here, the project has not become so final in engineering detail as to be ready to submit to bid. In making this judgment the court is well aware of and concerned by highway safety problems engendered by any delay that might result; with right-of-way acquisition still in process, however, any delay from impact statement making (and possible re-design) is not of substantial significance.

What then of the initial or prima facie showing by plaintiffs of environmental significance? They chose, on which to rest their case, a sharply-rising little limestone hill—a "Cobble" as it is called in this section of the country—and a beaver pond, of which Vermont has many hundred, but which at Chiselville has a rather extraordinary botanical significance. Will highway development be held up for one little hill and one beaver pond?

". . . [I]n Wildness is the preservation of the World." So says Thoreau; the Sierra Club has issued a beautiful book on this theme, bearing this title. "Every tree sends its fibers forth in search of the Wild," the Concord philosopher continues: "[t]he cities import it at any price." Indeed, the people come to Vermont from the cities because they cannot "import it." Wildness may not be shipped; it stays where it is, broken only by the intrusion of man. "Men plow and sail for it," Thoreau says, adding, "[f]rom the forest and wilderness come the tonics and barks which brace mankind." To those of us who are so fortunate to live in Vermont and to have a little wildness surrounding us, it is probably not so difficult as it may be for others to conceive in terms of the preservation of all mankind of the importance of a little limestone hill rising abruptly from a valley floor, covered with basil and marjoram and creeping thyme, with columbine and yellow ragwort in dramatic abundance.[1] The more so any of us find it difficult to conceive of the lasting, indeed the underlying importance of wetlands or bogs—perhaps because understandably we do not recognize, or we wish to forget, our own insignificant beginnings in what Judge

---

1. See G. Taggard, "The Nursery Rhyme and the Summer Visitor," A Part of Vermont (1945), quoted in Time in New England 231 (1950):

Green Mountain Mary, Green Mountain Mary,
What does your garden grow?
Violets, moss, ground pine, goldenrod, briars,
Strawberries, hardhack, wintergreen, ferns,

And a little bit of grass, alas.
Will you sell me your meadow?
Oh, no.
Who crops it?
Deer.
See here, Green Mountain Mary, you people are very,—
Excuse me—
Queer.

And see G. Aiken, Pioneering with Wildflowers *passim* (1935).

Learned Hand called the "primordial ooze."

We may agree with the authors of a newly published book[2] that "[t]here is then no 'balance of nature' unless it includes man as part of the balance . . . ," even while we "desire to conserve nature in many instances for unabashed aesthetic reasons and hold that these are basic, necessary and indeed do define the nature of man on a par with energetics, economics or any other reason; moreover we have Gorky's charge that aesthetics will be the ethics of the future."

■ The policy of the United States in the judgment of this individual federal judge is that an environmental impact statement is required before commencement of construction of the projects north of Arterial 7 to Manchester, wherein lies some of the most beautiful, semi-wild and pastoral countryside in this nation, in addition to the similar requirement relative to the Beltline, above mentioned. An injunction will issue accordingly and plaintiffs are ordered to submit such for approval; construction of Arterial 7 may proceed without further delay, however, and the injunction will be framed accordingly.

Judgment in accordance with opinion.

2. D. Wetherbee, R. Coppinger & R. Walsh, Time Lapse Ecology, Muskeget Island, Nantucket, Massachusetts (1972), *quoted* *in* Vineyard Gazette, May 26, 1972, at 2–B, col. 3.