The **ROBINSWOOD COMMUNITY CLUB et al., Plaintiffs-Appellants,**

v.

**John A. VOLPE, as Secretary of the United States Department of Transportation, et al., Defendants-Appellees.**

No. 72–2251.

United States Court of Appeals, Ninth Circuit.

March 26, 1974.

Rehearing Denied Dec. 23, 1974.

John A. McGary (argued), of Seattle, Wash., Gene Duncan (argued), Bellevue, Wash., for plaintiffs-appellants.

Jacques B. Gelin (argued), Kent Frizell, Thomas L. Adams, Dept. of Justice, Washington, D. C., Thomas R. Garlington, Asst. Atty. Gen. of Wash., (argued), Olympia, Wash., Albert E. Stephan, Asst. U. S. Atty., Seattle, Wash., Robert B. Rutledge, Regional Counsel, Federal Highway Administration, Portland, Or., for defendants-appellees.

OPINION

Before CHOY and WALLACE, Circuit Judges, and LYDICK,* District Judge.

---

* Honorable Lawrence T. Lydick, United States District Judge, Central District of California, sitting by designation.

**1368**

WALLACE, Circuit Judge:

Robinswood Community Club and a class comprised of its members (Robinswood) appeal from the denial of a preliminary injunction to enjoin federal and state officials from completing construction of the Eastgate interchange on a segment of Interstate Highway Project I-90 near Seattle, Washington. Robinswood alleges noncompliance with section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C), the Federal-Aid Highway Act, 23 U.S.C. § 109(b) and FHWA Policy and Procedure Memorandum (PPM) 20-8, 34 Fed.Reg. 728 (1969).

The design for the Eastgate interchange was conceived in 1962, though program and route approval by the Secretary of Transportation was not given until several years later. This controversy centers around the engineering design stage.[1]

The State of Washington, pursuant to PPM 20-8, held numerous meetings with community groups to explain the Richards Road to Lake Sammamish segment of I-90, of which the Eastgate interchange is an integral part. Comments and suggestions were solicited resulting in revisions to the state developed design. Several meetings were held in 1969 with representatives of the Robinswood Community Club. Based on the Club's recommendations the design of the interchange was altered and the Club expressed its appreciation by a letter approving the revised design.

A combined corridor and highway design public hearing for the Richards Road to Lake Sammamish segment was held on July 29, 1969, in accordance with PPM 20-8 § 6(b). At the hearing, a report was submitted which dealt with 23 social, economic and environmental effects of the proposed segment. Although the subjects of noise, air and water pollution were treated in a cursory fashion in the report, affidavits in the record reveal that the ecological effects of the design were discussed at the hearing. Suggestions offered at the design hearing were incorporated into the final design which was submitted to and approved by the Secretary of Transportation on December 11, 1969.

In 1970, after final design approval by the federal government and absent any objection, the Washington State Department of Highways proceeded with detailed design, acquisition of right of way and preparation of contract plan documents.

Robinswood first sought injunctive relief supported by a single affidavit alleging irreparable harm on April 13, 1971. The motion was denied on August 27, 1971. Eight months later, during which the State of Washington let some $10,000,000 in construction contracts, Robinswood again sought a preliminary injunction, which was denied on April 21, 1972. The district judge concluded that since final design approval by the federal government had been given prior to the effective date of NEPA, an impact statement was not required. This appeal followed. We affirm.

To obtain a preliminary injunction Robinswood must satisfy at least two requirements: First, it must demonstrate a strong likelihood or reasonable certainty that it will prevail on the merits; second, it must show it will suffer irreparable injury if the injunction is not granted. Sierra Club v. Hickel, 433 F.2d 24, 33 (9th Cir. 1970), aff'd on other grounds, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The granting or denial of a motion for preliminary injunction rests within the sound discretion of the trial court. County of Santa Barbara v. Hickel, 426 F.2d 164, 168 (9th Cir. 1970). Accordingly, we must decide whether the district judge abused his discretion.

---

1. This circuit recently examined the five stages in the construction of a federally financed highway in Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971). The stages are: program, routing, engineering design, right-of-way acquisition and actual construction.

## I. The National Environmental Policy Act of 1969

Section 102(2)(C) of NEPA requires an impact statement for major federal actions significantly affecting the quality of the human environment. Complications arise when a project such as we are concerned with here, straddles the effective date of NEPA, January 1, 1970.

The Council on Environmental Quality (CEQ), the watchdog organization created by NEPA, issued guidelines requiring all federal agencies to direct their efforts at meeting national environmental goals. Each agency was ordered to comply with section 102(2)(C) to the fullest extent possible. Specific reference was made to existing projects or programs:

11. *Application of section 102(2)(C) procedure to existing projects and programs.* To the maximum extent practicable the section 102(2)(C) procedure should be applied to further major Federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of the Act on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further incremental major actions be shaped so as to minimize adverse environmental consequences. It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program.

36 Fed.Reg. 7727 (1971).

Each agency was entrusted with the responsiblity of developing its own formal procedures to identify instances where environmental impact statements were required. The procedures were to be consonant with the Council's guidelines. Pursuant to this mandate, the Department of Transportation issued PPM 90–1 on August 24, 1971. Section 5b of the Memorandum, designating when a section 102(2)(C) statement shall be prepared for a highway segment, provides:

An environmental statement . . . shall be prepared and processed in accordance with this memorandum for each highway section which received design approval on or after January 1, 1970, and before February 1, 1971, and which constitutes a major action significantly affecting the environment . . . if, in the judgment of the FHWA division engineer, implementation of the National Environmental Policy Act to the fullest extent possible requires preparation and processing of an environmental statement. In making his judgment the FHWA division engineer should consider, in addition to the written reassessment prepared by the HA . . . for each such highway section, the status of the design; right-of-way acquisition including demolition of improvements within the right-of-way; number of families already rehoused and those yet to be rehoused; construction scheduling; benefits to accrue from the proposed highway improvement; significant impacts; and measures to minimize any adverse impacts of the highway.

The district court ruled that PPM 90–1 § 5b did not require compliance with section 102(2)(C) because the Secretary of Transportation had given final design approval prior to the effective date of NEPA. The issue presented is whether the date of final design approval is the controlling criterion for determining the applicability of NEPA to ongoing highway projects.

Federal courts have frequently grappled with the question of the retrospective application of NEPA. Some courts have adopted the date of final design approval by the Secretary of Transportation as the peg date for the application of NEPA. Concerned Citizens of Marlboro v. Volpe, 459 F.2d 332, 335 (3d Cir. 1972); *see* Pennsylvania Environmental Council, Inc. v. Bartlett, 454 F.2d 613, 624 (3d Cir. 1971) (Secretary's final approval). Other courts have focused on

the degree of completeness of a federal highway project and denied retrospective application of section 102(2)(C) to projects where federal participation was virtually complete. Ragland v. Mueller, 460 F.2d 1196 (5th Cir. 1972). Still other courts have determined the application of section 102(2)(C) not solely on the basis of the date of final approval, but also on the basis of a number of factors including, among others, CEQ guidelines, extent of construction on the project, extent of public participation in the planning stages and likelihood of harm to the environment. *E. g.*, Northside Tenants' Rights Coalition v. Volpe, 346 F.Supp. 244 (E.D.Wis.1972); Indian Lookout Alliance v. Volpe, 345 F.Supp. 1167 (S.D.Iowa 1972), modified, 484 F.2d 11 (8th Cir. 1973); Conservation Society v. Volpe, 343 F.Supp. 761 (D.Vt.1972); Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Cal. 1972).

■ Although not faced with the issue in a case involving a highway project, we have already spoken on the general issue involved here in determining at what stage of development we can say a project is pre-NEPA. In San Francisco Tomorrow v. Romney, 472 F.2d 1021 (9th Cir. 1973), we analyzed the applicability of the Act in two urban renewal programs, both of which commenced prior to January 1, 1970. We held that section 102(2)(C) required that an environmental impact statement be filed in one case, but not in the other. The deciding factor was not whether buildings would be built or earth moved after the beginning date of the Act, but whether there were any further stages requiring major action by the government. That the government would later monitor the project was not a "major Federal action" pursuant to section 102(2)(C).

The same theory has application here. Once the engineering design stage is finalized, the plan, the implementation of which results in an impact on the environment, has been completed. Each house that is moved, each mound of dirt that is excavated, each ribbon of concrete that is laid has an impact on the environment, but that impact is determined by the plan already adopted. Of course, the government will have substantial participation in the project subsequent to January 1, 1970. But mere participation is not enough. The real question is whether the government's continued participation constitutes *"further* major Federal actions having a significant effect on the environment . . . ." 36 Fed.Reg. 7727 (1971) (emphasis added). After final design approval, nothing *further* occurs which (1) is major and (2) has a significant effect on the environment other than what is contemplated by the approved design. This analysis is completely consistent with our holding in *San Francisco Tomorrow*; indeed, a contrary holding would contravene its basic thrust.

■ We, therefore concur with the Secretary's apparent interpretation that NEPA becomes applicable only when the final design approval occurs after January 1, 1970. PPM 90–1 § 5b. We hold that NEPA is not applicable when final design approval occurred prior to that date and the subsequent participation does no more than carry out the approved design.

Admittedly, the cutoff line could be drawn anywhere. Every major federal action has at least a conception and an execution; every execution may adversely affect the environment. But governments, just as ordinary citizens, have a need for definiteness in the conduct of their affairs. In this sense, we view the applicability of NEPA to a project begun prior to its effective date as similar to that of a statute of limitations. Some rights will be saved but others will be lost when we apply an arbitrary standard to an ongoing series of events. Nevertheless, the standard must be applied and we believe that the point of final approval is the logical place. This makes a definitive point which can be appropriately called "major Federal action."

## II. *The Federal-Aid Highway Act*

■■ Robinswood contends that 23 U.S.C. § 109(b)[2] was not complied with because the geometric and construction standards for the Eastgate interchange were not adequate to meet anticipated traffic projections for the twenty-year period commencing on the date of federal approval. Robinswood produced an engineering study which purported to show that current traffic flow is at the projected 1990 level. Based on the record before us we cannot agree. The State of Washington made a traffic study which indicated compliance with the mandates of section 109(b). We are aware that such projections are rarely entirely accurate and that data can be contorted to produce a desired statistic. Nonetheless, the state traffic study was clearly admissible into evidence and we cannot say on the record before us that the trial judge could not rely on that report. His findings in regard to the report are not clearly erroneous.

## III. *FHWA Policy and Procedure Memorandum 20-8*

■ Robinswood alleges that because of certain deficiencies in the combined corridor and highway design hearing on July 29, 1969, a new design hearing is required. The deficiencies allegedly involved the failure to consider 23 social, economic and environmental factors in approving the location of the Eastgate interchange. We disagree. The record reveals that not only was a report prepared by the State of Washington concerning the 23 factors but also the factors were discussed at the design hear-

ing. This was sufficient for compliance with PPM 20-8.

Robinswood neither demonstrated a strong likelihood that it would prevail on the merits nor irreparable injury. Therefore, the district judge did not abuse his discreton in denying the injunction.

Affirmed.

CHOY, Circuit Judge (concurring):

I concur with my Brothers Wallace and Lydick in all of the foregoing majority opinion save that portion of it fixing the date of final design approval by the Secretary of Transportation as the controlling criterion for determining the applicability of NEPA to ongoing highway projects. Withal, I concur in the result reached by them affirming the judgment of the district court.

It strikes me as too mechanical, as well as wrong, to peg the date of final design approval for the purpose of applying NEPA to a highway project such as is involved here. I prefer the approach adopted in a number of recent decisions which determine the application of § 102(2)(C) of NEPA, 42 U.S.C. § 4332, not solely on the basis of the date of final design approval, but according to Council on Environmental Quality (CEQ) guidelines. Northside Tenants' Rights Coalition v. Volpe, 346 F.Supp. 244 (E.D.Wis.1972); Indian Lookout Alliance v. Volpe, 345 F.Supp. 1167 (S.D.Iowa 1972); Southern Vermont, Inc. v. Volpe, 343 F.Supp. 761 (D.Vt.1972); Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Cal. 1972); Morningside-Lenox Park Asso-

---

2. 23 U.S.C. § 109(b) provides in pertinent part:

The geometric and construction standards to be adopted for the Interstate System shall be those approved by the Secretary in co-operation with the State highway departments. Such standards, as applied to each actual construction project, shall be adequate to enable such project to accommodate the types and volumes of traffic anticipated for such project for the twenty-year period commencing on the date of approval by the Secretary, under section 106 of this title, of the plans, specifications, and estimates for actual construction of such project. Such standards shall in all cases provide for at least four lanes of traffic. The right-of-way width of the Interstate System shall be adequate to permit construction of projects on the Interstate System to such standards. The Secretary shall apply such standards uniformly throughout all the States.

ciation v. Volpe, 334 F.Supp. 132 (N.D. Ga.1971).

As related in the majority opinion, CEQ, the watchdog created by NEPA, issued guidelines requiring all federal agencies to comply with section 102(2)(C) to the maximum extent practicable, 36 Fed.Reg. 7727 (1971); and pursuant to a CEQ mandate that each agency develop its own formal procedures delineating when environmental impact statements were required, the Department of Transportation issued PPM 90–1 on August 24, 1971.

The guidelines require two distinct evaluations prior to the application of § 102(2)(C) to a federal highway project initiated prior to January 1, 1970. First, there must be further major federal action having a significant effect on the environment occurring after Janu-

ary 1, 1970. Second, preparation of an environmental impact statement must be practicable.

Federal participation in a highway project is not terminated when final design approval is given by the Secretary of Transportation. Design approval merely marks the completion of the third stage of a project.[1] Title 23 specifies numerous additional steps which must be taken by the federal government. States often request that the Secretary of Transportation aid in the acquisition of rights-of-way.[2] The Secretary must enter into a formal project agreement with the state concerning construction and maintenance.[3] This agreement must include clauses as to use of and access to rights-of-way.[4] The federal government plays an important role in regulating letting of contracts

---

1. See majority opinion, n. 1.

2. 23 U.S.C. § 107 provides in pertinent part as follows:

   § 107. *Acquisition of rights-of-way—Interstate System*

   (a) In any case in which the Secretary is requested by a State to acquire lands or interests in lands (including within the term "interests in lands", the control of access, thereto from adjoining lands) required by such State for right-of-way or other purposes in connection with the prosecution of any project for the construction, reconstruction, or improvement of any section of the Interstate System, the Secretary is authorized, in the name of the United States and prior to the approval of title by the Attorney General, to acquire, enter upon, and take possession of such lands or interests in lands by purchase, donation, condemnation, or otherwise in accordance with the laws of the United States (including the Act of February 26, 1931, 46 Stat. 1421), if—

   (1) the Secretary has determined either that the State is unable to acquire necessary lands or interests in lands, or is unable to acquire such lands or interests in lands with sufficient promptness; and

   (2) the State has agreed with the Secretary to pay, at such time as may be specified by the Secretary an amount equal to 10 per centum of the costs incurred by the Secretary, in acquiring such lands or interests in lands, or such lesser percentage which represents the State's pro rata share of project costs as determined in accordance with subsection (c) of section 120 of this title.

3. 23 U.S.C. § 110 provides as follows:

   § 110. *Project agreements*

   (a) As soon as practicable after the plans, specifications, and estimates for a specific project have been approved, the Secretary shall enter into a formal project agreement with the State highway department concerning the construction and maintenance of such project. Such project agreement shall make provision for State funds required for the State's pro rata share of the cost of construction of such project and for the maintenance thereof after completion of construction.

   (b) The Secretary may rely upon representations made by the State highway department with respect to the arrangements or agreements made by the State highway department and appropriate local officials where a part of the project is to be constructed at the expense of, or in cooperation with, local subdivisions of the State. Pub.L. 85–767, Aug. 27, 1958, 72 Stat. 894.

4. 23 U.S.C. § 111 provides as follows:

   § 111. *Agreements relating to use of and access to rights-of-way—Interstate System*

   All agreements between the Secretary and the State highway department for the construction of projects on the Interstate System shall contain a clause providing that the State will not add any points of access to, or exit from, the project in addition to those approved by the Secretary in the plans for such project, without the prior approval of the Secretary. Such agreements shall also contain a clause providing that the State will not permit automotive service stations or other commercial establishments for serv-

for a federally financed highway.[5] Actual construction cannot begin without final inspection and approval[6] nor is a state entitled to payment without the approval of the Secretary.[7] Federal participation permeates virtually every

ing motor vehicle users to be constructed or located on the rights-of-way of the Interstate System. Such agreements may, however, authorize a State or political subdivision thereof to use or permit the use of the airspace above and below the established grade line of the highway pavement for such purposes as will not impair the full use and safety of the highway, as will not require or permit vehicular access to such space directly from such established grade line of the highway, or otherwise interfere in any way with the free flow of traffic on the Interstate System. Pub.L. 85–767, Aug. 27, 1958, 72 Stat. 895; Pub.L. 87–61, Title I, § 104(a), June 29, 1961, 75 Stat. 122.

5. 23 U.S.C. § 112 provides as follows:
§ 112. *Letting of contracts*
(a) In all cases where the construction is to be performed by the State highway department or under its supervision, a request for submission of bids shall be made by advertisement unless some other method is approved by the Secretary. The Secretary shall require such plans and specifications and such methods of bidding as shall be effective in securing competition.
(b) Construction of each project, subject to the provisions of subsection (a) of this section, shall be performed by contract awarded by competitive bidding, unless the Secretary shall affirmatively find that, under the circumstances relating to such project, some other method is in the public interest. All such findings shall be reported promptly in writing to the Committees on Public Works of the Senate and the House of Representatives. Contracts for the construction of each project shall be awarded only on the basis of the lowest responsive bid submitted by a bidder meeting established criteria of responsibility. No requirement or obligation shall be imposed as a condition precedent to the award of a contract to such bidder for a project, or to the Secretary's concurrence in the award of a contract to such bidder, unless such requirement or obligation is otherwise lawful and is specifically set forth in the advertised specifications.
(c) The Secretary shall require as a condition precedent to his approval of each contract awarded by competitive bidding pursuant to subsection (b) of this section, and subject to the provisions of this section, a sworn statement, executed by, or on behalf of, the person, firm, association, or corporation to whom such contract is to be awarded, certifying that such person, firm, association, or corporation has not, either directly or in-

directly, entered into any agreement, participated in any collusion, or otherwise taken any action in restraint of free competitive bidding in connection with such contract.
(d) No contract awarded by competitive bidding pursuant to subsection (b) of this section, and subject to the provisions of this section, shall be entered into by any State highway department or local subdivision of the State without compliance with the provisions of this section, and without the prior concurrence of the Secretary in the award thereof.
(e) The provisions of this section shall not be applicable to contracts for projects on the Federal-aid secondary system in those States where the Secretary has discharged his responsibility pursuant to section 117 of this title. Pub.L. 85–767, Aug. 27, 1958, 72 Stat. 895.

6. 23 U.S.C. § 114 provides in pertinent part as follows:
§ 114. *Construction*
(a) The construction of any highways or portions of highways located on a Federal-aid system shall be undertaken by the respective State highway departments or under their direct supervision. Except as provided in section 117 of this title, such construction shall be subject to the inspection and approval of the Secretary. The construction work and labor in each State shall be performed under the direct supervision of the State highway department and in accordance with the laws of that State and applicable Federal laws. Construction may be begun as soon as funds are available for expenditure pursuant to subsection (a) of section 118 of this title. On any project where actual construction is in progress and visible to highway users, the State highway department shall erect such informational sign or signs as prescribed by the Secretary, identifying the project and the respective amounts contributed therefor by the State and Federal Governments.

7. 23 U.S.C. § 121 provides in pertinent part as follows:
§ 121. *Payment to States for construction*
(a) The Secretary may, in his discretion, from time to time as the work progresses, make payments to a State for costs of construction incurred by it on a project. These payments shall at no time exceed the Federal share of the costs of construction incurred to the date of the voucher covering such payment plus the Federal share of the value of the materials which have been stockpiled

aspect of a highway project. The Secretary does not merely monitor a highway project to assure compliance with statutory and contractual requirements but supervises contracting, construction, maintenance, and, in numerous instances, directly acquires rights-of-way. In the case before us, major federal action having a significant effect on the environment, in the form of the above statutorily prescribed steps, did occur after January 1, 1970.

Assuming that the first requirement of the CEQ guidelines is satisfied, we should consider whether it would be practicable to halt the construction of the highway segment involved while an impact statement is being prepared. We should examine the four factors suggested in Environmental Fund v. Volpe, *supra* at 1334–1335 of 340 F.Supp.: (1) the participation of the local community in the planning of a project; (2) the extent to which the state agency involved has attempted to take environmental factors into account in regard to a particular project; (3) the likely harm to the environment if the project is constructed as planned; and (4) the cost to the state of halting construction while it compiles an environmental impact statement.

The record reveals that the local community did participate extensively in the planning of the Richards Road to Lake Sammamish segment of I–90. · Robinswood itself was consulted on at least three occasions and made a suggestion which was later adopted. The state did take environmental factors into consideration and prepared a report concerning social, economic and environmental factors as required by PPM 20–8, 23 C.

F.R. Appendix A (1969). Though the report alone was not sufficient, these very issues were discussed at the combined corridor and highway design public hearing. The burden was on the appellants to establish the harm to the environment and this burden was not sustained by merely offering unsubstantiated allegations of potential damage. Finally, the State of Washington produced affidavits which estimated the potential loss because of inflation and breach of contract at $700,000 plus. An environmental statement is not practicable.

I would hold that under the CEQ guidelines an environmental statement is not required.

Contrary to the belief of the majority that deviating from the date of final design approval as the peg date would contravene our holding in San Francisco Tomorrow v. Romney, 472 F.2d 1021 (9th Cir. 1973), I discern no inconsistency in my position here and that holding. In *San Francisco Tomorrow*, we found that "[w]hen the National Environmental Policy Act became effective on January 1, 1970, the federal involvement in the Yerba Buena Project was virtually complete. In fact, for purposes of NEPA, major *federal* action had terminated on December 2, 1966 when HUD became contractually obligated to the San Francisco Redevelopment Agency for the loan and grants." And we held that monitoring the municipality's execution of the project to assure HUD that the undertakings of the December 2, 1966 contract were fulfilled involved no further major federal action. 470 F.2d at 1025. We were careful to distinguish decisional law in highway cases as misplaced when applied on this issue in

in the vicinity of such construction in conformity to plans and specifications for the project.

(b) After completion of a project in accordance with the plans and specifications, and approval of the final voucher by the Secretary, a State shall be entitled to payment out of the appropriate sums apportioned to it of the unpaid balance of the Federal share payable on account of such project.

(c) No payment shall be made under this chapter, except for a project located on a Federal-aid system and covered by a project agreement. No final payment shall be made to a State for its costs of construction of a project until the completion of the construction has been approved by the Secretary following inspections pursuant to section 114 (a) of this title.

urban renewal cases, pointing out other stages besides the design phase at which the NEPA impact statement should be filed. *id.*

Here, as I point out above, there were some four major federal actions following the date of design approval of this ongoing highway project. I would affirm the district court's holding that an impact statement was not required, but for the reasons stated above, not because final design approval had been given prior to the effective date of NEPA.