WESTSIDE PROPERTY OWNERS, an unincorporated association, et al., Plaintiffs,

v.

James R. SCHLESINGER, Secretary of Defense of the United States, et al., Defendants.

No. Civ. 75-26 PHX (WEC).

United States District Court, D. Arizona.

June 17, 1976.

Jeremy E. Butler, Lewis & Roca, Phoenix, Ariz., for plaintiffs.

Asst. U. S. Atty. Richard S. Allemann, Phoenix, Ariz., for defendants.

## OPINION

CRAIG, Chief Judge.

The above entitled cause came on for trial February 25, 26, and 27, 1976. Briefs were filed and final argument was made March 3, 1976.

Plaintiffs are the owners of real property interests in the vicinity of Luke Air Force Base, Maricopa County, in Arizona.

Defendants are the Secretary of Defense of the United States, the Secretary of the Air Force of the United States, the Commander of Luke Air Force Base and the Wing Commander at Luke Air Force Base.

Plaintiffs generally assert violation of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq., specifically asserting inadequacy of the Environmental Impact Study in the beddown of the F–15 fighter plane at Luke Air Force Base, Arizona. Plaintiffs assert damages as a result of noise pollution, air pollution, and aircraft accidents.

Jurisdiction in this court is asserted by virtue of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (*Life of the Land v. Brinegar*, 485 F.2d 460, 9 Cir.); Title 28 U.S.C. § 1331(a); and 28 U.S.C. § 1361.

Luke Air Force Base has been in operation since March, 1941, with its primary function, the training of fighter pilots of the United States Air Force. Jet aircraft have been flying at Luke from 1951 to the present time. The F–100 was introduced in 1957 and phased out in October, 1971. The F–104 was introduced in April of 1964 and is still flying. The F–4 was introduced in May, 1971, and is still flying.

Two F–15 aircraft arrived at Luke Air Force Base in September, 1974, and began flight operations in November, 1974. As of February 19, 1976, there were 34 F–15 aircraft at Luke Air Force Base.

The F–15, in all probability, is the most sophisticated, fastest and most maneuverable fighter aircraft in the world today. With the development of the F–15, the United States Air Force was confronted with the logistical problem in the selection of a site which would give the optimum advantage in training pilots to fly this advanced aircraft in operation and weapon systems delivery. Early in 1970, the Air Force began its review of facilities available to it.

In September, 1970, Program Document 72–2 of the United States Air Force contained the first reference to the beddown of the F–15 aircraft at Luke Air Force Base. Quarterly thereafter, the United States Air Force and Units of Programming Documents showed the beddown of various numbers of F–15 aircraft at Luke Air Force Base. This includes the quarterly reports in the Programming Documents dated March, 1972, March, 1973, and March, 1974.

On or about the 17th of September, 1971, the United States Air Force issued a general Environmental Impact Statement regarding the acquisition of the F–15 aircraft.

On or about May 11, 1970, the United States Air Force issued an Environmental Impact Statement in connection with stationing the F–4 aircraft at Luke Air Force Base.

In 1972, the Commander of the United States Air Force Tactical Air Command, General William W. Momyer directed his staff to do a study of the TAC fighter force structure and basing options. This study included an assessment of the operational and training environments and the ecological impacts the actions would have. Based upon the results of that study, General Momyer concurred with the 1970 Programming Document which programmed the F–15 training for Luke Air Force Base.

Local controversy had caused an Environmental Impact Statement to be filed on the move of the F–4 into Luke during 1970. See Congressional Record, April 28, 1971 at E607. It was anticipated that a similar controversy would result from the proposed action of bedding down the F–15 at Luke Air Force Base. Therefore, it was requested that TAC begin preparation of an Environmental Impact Statement on the proposed action. On March 5, 1974, the candidate Environmental Impact Statement for the beddown of the F–15 was circulated for review and comment. Following the circulation of the candidate Environmental Impact Statement by the Air Force, a draft Environmental Impact Statement was printed and circulated for Air Force review and comment. The draft Environmental

Impact Statement was filed with the Council on Environmental Quality and circulated to other federal and state agencies and the public, and on May 6, 1974, the announcement of the filing was published in the Federal Register.

The Air Force held a public hearing regarding the draft Environmental Impact Statement on June 17, 1974, at the Maricopa County Board of Supervisors Auditorium in Phoenix.

Following the 45 day review and comment period on the draft Environmental Impact Statement, the public hearing, and Internal Air Force Review, the final Environmental Impact Statement was circulated for Air Force approval. Major General J. F. Kern, Assistant DCS/Programs and Resources, Headquarters USAF, concluded the decision making on behalf of the Air Staff by concurring with the final Environmental Impact Statement on or about July 23, 1974. Dr. Billy E. Welch, Special Assistant for Environmental Quality, Headquarters USAF filed the final EIS with the Council on Environmental Quality on August 1, 1974. The Council on Environmental Quality Guidelines require a 30 day waiting period after filing the final statement before the proposed action can start. Thus, the beddown of the F–15 at Luke could have begun on August 31, 1974.

■ Plaintiffs assert that in bedding down the F–15 at Luke Air Force Base, the United States Air Force has not complied with Title 42 U.S.C. § 4332(2)A because it did not utilize a system of interdisciplinary approach in its decision making. 42 U.S.C. § 4332(2)A states that agencies of the federal government must: ". . . utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment. . . ." The section requires a "diligent research effort" which "reflects the current state of the art of relevant scientific discipline." *Environmental Defense Fund v. Hardin*, 325 F.Supp. 1401, D.C.D.C.

The Environmental Impact Statement, defendants' Exhibit C in evidence, reflects the in-depth and comprehensive research effort that was involved in its preparation. The Environmental Impact Statement covers Air Quality Impacts, Visual Impacts, Noise Impacts, Impact on Land Use, and Socioeconomic Impacts, as well as others. Each of these sections contains an in-depth study and thorough explanation of all relevant matters.

The interdisciplinary approach that was used in developing the final Environmental Impact Statement insured the "integrated use of the natural and social sciences and the environmental design arts" in the decision making process as required by 42 U.S.C. §. 4332(2)A.

■ Plaintiffs seem to assert a violation of 42 U.S.C. § 4332(2)C, because the Air Force employed the services of Arthur D. Little, Inc., a nationally recognized consulting firm to assist it in the preparation of the Environmental Impact Statement contemplated by that section. 42 U.S.C. § 4332(2)C.

■ 42 U.S.C. § 4332(2)C requires a detailed statement of the environmental impact of a federal project by the responsible federal official, it does not, however, state how the official should obtain the information upon which his statement is based. *Iowa Citizens for Environmental Quality v. Volpe*, 487 F.2d 849, 8 Cir. Nor does it require that the head of the agency personally review and approve the Environmental Impact Statement. *Life of the Land v. Brinegar*, 485 F.2d 460, *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312. The act allows the responsible federal official to delegate some of the preparation of the Environmental Impact Statement. The requirement of 42 U.S.C. § 4332(2)C is that the federal agency must bear the responsibility for the ultimate work product. *Id.* at 467. See also *Sierra Club v. Lynn*, 502 F.2d 43, 5 Cir.; *Citizens Environmental Council v. Volpe*, 484 F.2d 870, 10 Cir., *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 and *Iowa Citizens for Environmental Quality, supra.*

In *Life of the Land, supra,* federal and state officials had employed the services of the Ralph M. Parsons Company, a private consulting firm. The plaintiffs asserted that the preparation of the Environmental Impact Statement had been "improperly delegated to a private consulting firm which had a major and direct contingent financial interest" in the approval of the proposed action. The court stated: "It does appear from the record that Parsons had a financial interest in an affirmative decision on the proposed project. We find nothing, however, in either the wording of NEPA or the case law, which indicates that, as a matter of law, a firm with a financial interest in the project may not assist with the drafting of the EIS." Rather, the court deemed the relevant inquiry to be whether there was "significant and active participation" by the agency in the preparation of the EIS. The court stated that the record indicated active agency participation in all phases of the EIS preparation and, therefore, held that there was no improper delegation of the preparation of the EIS.

In this case the record discloses that the Air Force participated significantly and actively in the preparation of the EIS and the final effort was an Air Force product.

Since it has been held in *Life of the Land, supra,* that a private consulting firm with a financial interest in an affirmative decision on the proposed action may assist in preparation of the EIS, a fortiori where the private consulting firm had no financial interest in the final decision on the proposed action, its assistance in preparing the final EIS cannot be held to have been improper.

■ The plaintiffs assert that the Air Force failed to comply with 42 U.S.C. § 4332(2)D by improperly studying, developing, or describing the alternative of establishing a new Air Force Base at Gila Bend, Arizona. Specifically, they assert that implementation of this alternative would be preferable over the proposed action of bedding down the F–15 at Luke Air Force Base and that the discussion of this alternative in the EIS is both misleading and inaccurate.

■ In *Life of the Land v. Brinegar, supra,* the court made it clear that NEPA does not require federal agencies to include detailed evaluations of every imaginable alternative that might conceivably be used to effectuate a proposed objective falling within the purview of the act. Instead, citing *Natural Resources Defense Council v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, the court held that the mandated discussion of alternatives is circumscribed by a rule of reason. In so holding, the court observed: "Certainly, the statute shall not be employed as a crutch for chronic fault-finding. Accordingly, there is no need for an EIS to consider an alternative whose implementation is deemed remote and speculative. *Id.* at 834. Rather, the EIS need only set forth those alternatives 'sufficient to permit a reasoned choice.' *Id.* at 836." 485 F.2d at 472. More recently, in *Trout Unlimited v. Morton,* 509 F.2d 1276, 9 Cir., the court reaffirmed this principle and held that the range of alternatives that must be considered in an EIS "need not extend beyond those reasonably related to the purposes of the project." See also *Friends of the Earth v. Coleman,* 513 F.2d 295, 9 Cir.

In *Natural Resources Defense Council v. Morton, supra,* the court found that various alternatives to the federal leasing of tracts on the Outer Continental Shelf for oil and gas exploration merited differing depths of discussion depending upon the relation that the particular alternative bore to the problem at hand. Since the objective in that case was to satisfy a near-term energy short-fall, long-term solutions bearing little relationship to that problem could be dismissed with relatively brief mention. Accordingly, the court ruled that only cursory discussions were permissible with respect to the alternatives of developing oil shale, tar sands, and geothermal resources and desulfurizing, liquifying, and gasifying coal, but that more detailed discussions were in order with respect to the alternatives of increasing nuclear energy development, freeing current offshore production from state market demand prorationing, and changing the Federal Power Commission's natural gas pricing policies. In the last analysis, the

court implied, this same rule of reason operates to ensure that the responsible federal officials and agencies take the requisite "hard look" at the environmental consequences of the various *feasible* alternatives to proposed courses of action. Beyond that, "the court does not seek to impose unreasonable extremes or to interject itself within the area of discretion of the executive as to the choice of the action to be taken." 458 F.2d at 838.

In the instant case, the "hard look" has been taken. The EIS reveals that the Air Force made a good faith presentation of the environmental impact incident to *reasonable* alternative courses of action. *Iowa Citizens for Environmental Quality, Inc. v. Volpe, supra.* Consequently, "the question to be asked is whether all reasonable alternatives to the project have been considered, even if some were only briefly alluded to or mentioned." *Environmental Defense Fund, Inc. v. Armstrong,* 352 F.Supp. 50, D.C.Cal.

■ The standard frequently cited by other courts for determining whether or not an EIS satisfies NEPA's procedural requirements has been one of "reasonable compliance". *See National Helium Corp. v. Morton,* 455 F.2d 605, 10 Cir.; *Natural Resources Defense Council v. Morton, supra.* In *Lathan v. Brinegar,* 506 F.2d 677, 9 Cir., subsequently expanded in *Trout Unlimited v. Morton, supra,* the court stated in *Trout* : "It follows, therefore, that in determining whether the appellees prepared an adequate EIS we will be guided in large part by 'procedural rules' rooted in case law. No synthesis of these rules will be attempted other than to point out that all such rules should be designed so as to assure that the EIS serves substantially the two basic purposes for which it was designed. That is, in our opinion an EIS is in compliance with NEPA when its form, content, and preparation substantially (1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in light of its environmental consequences, and (2) make available to the public, information of the proposed project's

environmental impact and encourage public participation in the development of that information." 509 F.2d at 1283.

Courts are not to "fly speck" environmental statements since "the preparation of such . . . statements calls for judgment, and that judgment is the agency's." *Lathan v. Brinegar, supra* at 693.

■ In the instant case, the EIS, and particularly the discussion of alternatives contained therein, satisfies the two-fold requirement enunciated in *Trout Unlimited v. Morton, supra.* The discussion of an alternative (Gila Bend) whose implementation would require a lead-time of at least three years and an expenditure of additional millions of dollars need not consume the same detail required for more immediate solutions to the near term requirement. *Natural Resources Defense Counsel v. Morton, supra.* Neither the alternative of establishing a new base at Gila Bend nor the alternative of transferring flight line activities to that location is feasible in view of the extensive time and cost involved or the results of such a proposal upon morale, community and natural resources, and the physical environment.

■ The National Environmental Policy Act does not give to the courts the ultimate authority to approve or disapprove a properly authorized project where an adequate EIS has been prepared and circulated in accordance with the NEPA requirements. Final judgments of project justification are not subject to review in an action to consider the adequacy of an EIS under NEPA. Peripheral evaluations of alternatives are not the courts function. See *Environmental Defense Fund v. Armstrong,* 487 F.2d 814, 9 Cir. The judiciary's principal role is to insure compliance with the required methodology, and not to provide a forum for the expression of substantive disagreements arising from the utilization of that methodology. The record in the instant case fails to disclose the Air Force to have acted in an arbitrary or capricious manner.

This court at the request of counsel visited Luke Air Force Base during flight operations. Observations were conducted at 3

primary locations. The first was made to the north of the base, on the roadway adjacent to the home of the plaintiffs Bumstead. At that location, the court was situated in an automobile with windows down and the radio adjusted in volume to a comfortable conversational tone from a news broadcast station. Several aircraft took off from Luke Air Force Base, including two F–15s, several F–4s and F–104s and several other aircraft. In no instance did interference with the conversational tone of the radio exceed ten seconds. A heavy duty truck that passed interfered for seven seconds. Timing was accomplished with a stop watch.

The second point of observation was across the road from the Dysart School. These observations were made at the side of a road where counsel, Air Force personnel and the court were standing and conversing. The results were the same in that no conversation was interrupted for a period in excess of ten seconds.

The third point of observation was to the southwest of the base, at a point west of the initial let down for landing. Observations were made of several landings by various aircraft, including several F–15s. The F–15 seemed to produce the least noise of the several aircraft observed.

While plaintiffs assert air pollution as one of their objections, there was no viable evidence adduced at trial to indicate that air pollution caused by the F–15 is a substantial factor.

Plaintiffs further assert the accident hazard as a further ground for complaint. Several accidents have occurred in the vicinity of Luke Air Force Base over the years. No evidence was adduced at trial that any accident involved death, injury, or property damage to resident property owners of the area.

So long as machines are made and controlled by man, they will not be perfect. It is a reasonable assumption that man will not achieve perfection in the foreseeable future, and thus his machines will not achieve perfection. It is reasonably to be concluded therefore that malfunction and accidents will continue to occur with airplanes as well as automobiles and other man-made devices.

With the exception of plaintiffs' witnesses Bumstead and Justin, all of the plaintiffs acquired their properties subsequent to the establishment of Luke Air Force Base. This fact is also true as to the residents of Sun City, Arizona, which lies several miles north of the Air Force Base. While the farmers and ranchers in the area had some complaint with respect to the noise, the main thrust of their complaint seemed to be the coordination or lack thereof with respect to their crop-dusting activities vis a vis Air Force flight operations from Luke. No evidence was offered with respect to a reduction of land values in the area as a result of the F–15's operation. Moreover, the coordination problem between crop dusting and Luke flight operations would be the same if the Air Force elected to use nothing but Piper Cubs in its pilot training program. This problem appears to be a logistical one as distinguished from a legal one.

Upon consideration of all of the evidence adduced at trial by all parties, it is the conclusion of this court that the Air Force complied with the provisions of the Environmental Policy Act of 1969 in the preparation and promulgation of the Environmental Impact Statement with respect to the beddown of the F–15 aircraft; that the Air Force complied with the provisions of the Administrative Procedure Act.

In weighing the interests of the public as against those of plaintiffs, it is the conclusion of this court that the interests of the public in the maintenance of a viable Air Force, including the bedding down of the F–15 at Luke Air Force Base, Maricopa County, Arizona outweighs the mild inconvenience to residents in the area where plaintiffs are located by virtue of the noise created by the take off and landing of the F–15 aircraft.

All prior orders entered in this litigation are confirmed.

The foregoing Opinion constitutes the Findings of Fact and Conclusions of Law

contemplated by Rule 52, Federal Rules of Civil Procedure.