1214

WESTSIDE PROPERTY OWNERS, an Unincorporated Association consisting of Tal-Wi-Wi Ranches, Inc., Roach and Baker Ranches, Inc., Baker and Roach Sunny Valley Citrus, Inc., Nalbandian Farms, Inc., Smith, Bryan, and Smith, Margaret, Trustees of the Bryan and Margaret Smith Revocable Trust, Mehren, Lawrence (withdrawn) Ashby, Ralph, and Ashby, Grace L. Arakelian, Zeke Arakelian, George and Seitz, John, Plaintiffs-Appellants,

v.

SCHLESINGER, James R., Sec'y of Defense, McLucas, John L., Sec'y of the Air Force, Gibson, Colonel Boyd E., U. S. Air Force, Commander, Luke Air Force Base; Haeffner, Brig. Gen. Fred A., Wing Commander, Luke Air Force Base, Schmidt, Major Armand, Sq. Com., Second German Air Force of the Federal Republic of West Germany, Brinegar, Claude S., Sec'y of Transportation, and Butterfield, Alexander P., Administrator of the Federal Aviation Admin., Defendants-Appellees.

No. 77–1217.

United States Court of Appeals, Ninth Circuit.

May 7, 1979.

Rehearing Denied June 18, 1979.

Jeremy E. Butler, Phoenix, Ariz., for plaintiffs-appellants.

Peter R. Taft, Asst. Atty. Gen., Washington, D. C., Fransis S. Ainsa, Jr., El Paso, Tex., for defendants-appellees.

Before BARNES and CHOY, Circuit Judges, and BARTELS,* District Judge.

CHOY, Circuit Judge.

Plaintiffs below appeal from the district court's judgment rejecting their claims. We affirm.

I. *Statement of the Case*[1]

Luke Air Force Base (Luke), located near Phoenix, Arizona, was established in 1941.

---

* The Honorable John R. Bartels, Senior United States District Judge for the Eastern District of New York, sitting by designation.

1. For a more detailed statement of the facts underlying this appeal, see the district court's published opinion, 415 F.Supp. 1298 (D.Ariz. 1976).

Jet aircraft operations began there in 1951. Over the years newly-developed jets have been placed at Luke. Luke has also been the site of training of pilots from our allies' air forces, including West German pilots.

On January 1, 1970, the National Environmental Policy Act (NEPA) went into effect. 42 U.S.C. §§ 4321–4361. Beginning in September of 1974, the Government located F–15 aircraft at Luke. Prior to and during the stationing of the F–15 aircraft at Luke, the Air Force had prepared environmental impact statements (EIS).

Owners of lands near Luke filed suit through their unincorporated association against numerous federal officials involved in Luke operations,[2] challenging the training of German pilots and location of the F–15 at Luke. They sought declaratory, injunctive, monetary, and mandamus relief. Their complaint contained six counts, each of which was rejected by the district court. They appeal as to four counts.

II. *Count I: Location of F–15 Aircraft at Luke*

■ Section 102 of NEPA, 42 U.S.C. § 4332, provides in part that

all agencies of the Federal Government shall—

.   .   .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Pursuant to this requirement of an EIS, the Air Force had prepared an EIS dealing with its proposal to locate F–15 aircraft at Luke. Appellants' complaint alleged that the EIS did not satisfy statutory requirements. After extensive written and oral argument, a trial, and personal observations of Luke, the district court held that the Air Force's EIS satisfied statutory requirements. 415 F.Supp. 1298 (D.Ariz.1976). Appellants claim that the district court erred in three major respects.[3]

---

**2.** Named as defendants were the Secretary of Defense, Secretary of the Air Force, Wing Commander of Luke Air Force Base, Commander of Luke Air Force Base, Secretary of Transportation, and Administrator of the Federal Aviation Administration. We will refer to these defendants-appellees as the "Government," distinguishing any of them only as relevant.

Appellants also named as defendant Major Armand Schmidt of the Air Force of the Federal Republic of Germany. Although appellants filed their appeal as to Major Schmidt as well as the American officials, they indicated that they did not disagree with the district court's actions as to Major Schmidt. Accordingly, this court prior to oral argument dismissed the appeal as it pertained to Major Schmidt.

**3.** Appellants also contend that there was evidence from which one could draw inferences different from those drawn by the district court. They have not shown, however, that the

district court's findings were clearly erroneous. Fed.R.Civ.P. 52(a).

Appellants also argue that the district court, in writing its opinion, improperly copied "nearly verbatim the arguments submitted by the federal defendants in support of their motion for summary judgment . . . ." Although this court has warned of the dangers of summarily adopting the proposed findings of the victorious party, *see Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1339–40 (9th Cir. 1971), if the content of the district court's opinion is not erroneous, we do not believe the *source* of that opinion should taint it. Moreover, we note that in this case the district court carefully modified the Government's arguments as it felt proper, thereby dispelling the fear that the district court too readily accepted the victors' words.

Appellants contend lastly that the district court erred because its opinion did not expressly respond to or comment upon every factual and legal argument made by appellants. We

A. *Incremental or Total Environmental Effects*

■ Appellants argue that the EIS stated only that the "beddown" of the F–15 at Luke "will not cause any increased adverse environmental effects," but did not discuss the total environmental effect of Luke operations. They claim that the EIS should also discuss the pollution effects of present Luke operations (other than the F–15) so that the cumulative effect of introducing the F–15 to Luke may fully be ascertained.

In *County of Suffolk v. Secretary*, 562 F.2d 1368 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978), the Second Circuit noted:

> In making such a determination [of whether an EIS contains sufficient information to satisfy § 102(2)(C) of NEPA], a court is governed by the "rule of reason," under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives. [Citations omitted.]

*Id.* at 1375; *see Sierra Club v. Andrus*, 581 F.2d 895, 903 (D.C. Cir. 1978), *cert. granted sub nom. Andrus v. Sierra Club*, —— U.S. ——, 99 S.Ct. 829, 59 L.Ed.2d 30 (1979). Rather than imposing a per se rule requiring detailed discussion of overall environmental effects, the rule of reason means that the inquiry is whether, and to what degree, discussion of the overall environmental impact of on-going operations is necessary reasonably to set forth sufficient information to enable the decision-maker to consider the environmental factors and to make a reasoned decision. Here the EIS

stated that advent of the F–15 would not increase significantly the pollution at Luke. Under the circumstances of this case, the district court did not err in concluding that the EIS was sufficient.

Appellants cite numerous cases they read as requiring very extended discussion of the cumulative and overall effects of the F–15. However, even those cases most helpful to appellants' claim do not indicate that the EIS here was inadequate. For example, in *Virginians for Dulles v. Volpe*, 541 F.2d 442, 445 (4th Cir. 1976), the Fourth Circuit held that *"the vastly expanded use* of the [Washington, D.C. area] airports requires an impact statement." *Id.* at 445 (emphasis added). Similarly, in *Illinois ex rel. Scott v. Butterfield*, 396 F.Supp. 632 (N.D.Ill.1975), the state of Illinois sued the Federal Aviation Administration and the Civil Aeronautics Board, claiming that expansion of activities at O'Hare International Airport violated NEPA. The court rejected the claim that the expansion was insulated from NEPA "simply because O'Hare International reached its tremendous size prior to enactment of the N.E.P.A." *Id.* at 640. Noting that plaintiffs challenged the "further *increase* in aircraft traffic and operations," the court wrote:

> [W]hile no claim would lie which compels the production of an environmental impact statement reviewing the feasibility of maintaining O'Hare as a major commercial international airport in light of its reputation as a significant source of pollution, we believe a claim would lie which compels the production of a statement giving consideration to the environmental effects of activities creating increased operational growth of the Airport.

*Id.*

Here, there was no significant increase in operations producing a significant increase in pollution that could only be evaluated in the context of very detailed discussion of on-going operations. Indeed, the number

---

do not believe that the district court has an obligation to address explicitly every point raised by the parties. The district court's thor-

ough and well-reasoned opinion adequately stated the facts found and the court's conclusions of law. *See* Fed.R.Civ.P. 52(a).

of flights at Luke has decreased since introduction of the F–15. In effect, appellants seek to turn the EIS regarding the introduction of the F–15 into an evaluation of maintaining Luke as an air force base at all. Even the authorities relied upon by appellants reject such an attempt.

## B. Rationalization

■ Appellants contend that the preparation of the EIS was only a rationalization for a decision already made by the Government. They argue that NEPA requires that the decision-maker carefully consider the EIS in reaching its decision and that the Air Force's failure to do so here violates NEPA.[4]

The district court found that although the initial steps of determining to beddown the F–15 at Luke were taken before preparation of the EIS, the process of decision-making proceeded hand-in-hand with preparation and promulgation of the EIS. 415 F.Supp. at 1300–01. Also, although the Government felt that exigencies of national defense required taking steps to deploy the F–15 prior to final preparation of the EIS, the decision-makers reviewed the EIS before finalizing the F–15 decision. Id. at 1301. Thus, the district court found that the Government considered the EIS in its decision-making. This finding is not clearly erroneous. See Fed.R.Civ.P. 52(a).

## C. Consideration of Alternatives

The district court noted that decisions of this court indicated that the statutory requirement of consideration of alternatives did not require consideration of every imaginable alternative. Rather, " 'the EIS need only set forth those alternatives "sufficient to permit a reasoned choice." ' " 415 F.Supp. at 1302, quoting Life of the Land v. Brinegar, 485 F.2d 460, 472 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); see Trout Unlimited v. Morton, 509 F.2d 1276, 1286 (9th Cir. 1974). Cognizant of that standard, the district court concluded:

4. We assume arguendo that NEPA requires that the decision-maker carefully consider the EIS. We do not address the Government's

In the instant case, the "hard look" has been taken. The EIS reveals that the Air Force made a good faith presentation of the environmental impact incident to reasonable alternative courses of action.

415 F.Supp. at 1303.

Appellants contend that this conclusion must be rejected because, in evaluating the alternatives, the EIS did not take into account the overall environmental effect of Luke. We have already rejected the premise of this argument. See part IIA supra.

■ Appellants also contend that there was evidence in the record which could be read as establishing that greater care could have been taken with respect to discussing alternatives. We decline appellants' invitation to reweigh the evidence; we affirm the district court's conclusion that the EIS adequately discussed reasonable alternatives to bedding down the F–15 at Luke. See Life of the Land, 485 F.2d at 472.

## D. Conclusion

The district court concluded:

Upon consideration of all of the evidence adduced at trial by all parties, it is the conclusion of this court that the Air Force complied with the provisions of the Environmental Policy Act of 1969 in the preparation and promulgation of the Environmental Impact Statement with respect to the beddown of the F–15 aircraft

. . . .

415 F.Supp. at 1304. Appellants have not shown that the district court erred in this conclusion.

## III. Count II: Taking Without Just Compensation

Appellants alleged that Luke activities reduced the value of their property and thereby effected a taking of property without just compensation in violation of the Fifth Amendment to the Constitution.

contention that as long as the EIS satisfies the technical requirements of NEPA, the attention paid to it by the decision-maker is irrelevant.

Specifically, they claimed that overflights and other Luke activities interfered with their communication and enjoyment of activities like watching television and sleeping. They also claimed that noise pollution and fear of crashes reduced property values. They sought injunctive and declaratory, but not monetary, relief. The district court dismissed the claim. It also refused later to transfer the claim to the Court of Claims.

### A. *Dismissal of Count II*

■ Although acknowledging that the district court would otherwise lack jurisdiction over count II because of sovereign immunity, appellants urge that their claim falls within the exception enunciated in *State of Washington v. Udall*, 417 F.2d 1310 (9th Cir. 1969). There this court indicated that under some circumstances sovereign immunity would not bar a suit claiming that Government officials had engaged in ultra vires acts, even though immunity had not otherwise been waived. *Id.* at 1316. Appellants claim that in allowing Luke activities, defendants-appellees have exceeded their statutory authority given a statute prohibiting the military from acquiring real property not owned by the United States unless properly authorized. 10 U.S.C. § 2676.[5]

*State of Washington v. Udall* is not applicable to the instant case. First, although appellants utilize the forms of ultra vires analysis, the essence of their complaint is not that appellees have acted in an ultra vires manner and this exceeding of authority has harmed them. Rather, appellants claim that the Luke activities—whether ultra vires or not—annoy them and harm property values. Thus, *State of Washington v. Udall*, concerned with affording persons a method of challenging ultra vires acts by Government officials, is not relevant here. *See* 417 F.2d at 1316–17.

Second, this court has noted an exception to the *State of Washington v. Udall* exception to the sovereign immunity doctrine. In *State of Washington v. Udall*, the court wrote:

> [T]he purposes [of] the doctrine of sovereign immunity may be controlling in some suits . . . so that the suits must be dismissed as suits against the Government, even though the officers were not acting pursuant to valid statutory authority, because the relief sought would work an intolerable burden on governmental functions, outweighing any consideration of private harm. In such cases a party must be denied all judicial relief other than that available in a possible action for damages. [Citation omitted.]

*Id.* at 1318. Later cases have indicated that the court must balance the burden on governmental functions against the private harm if immunity is found. *See, e. g., Martinez v. Marshall*, 573 F.2d 555, 560–61 (9th Cir. 1977); *De Lao v. Califano*, 560 F.2d 1384, 1391 (9th Cir. 1977).

In the instant case appellants prayed for, *inter alia*,

> An order permanently restraining the defendants . . . from operating . . any . . . aircraft, from Luke Air Force Base in such a way as to deprive the plaintiffs of the enjoyment and use of their interest in real property as a result of noise pollution caused by said aircraft.

Although the cry of "national defense" cannot justify Government illegality, we note that appellants' requested relief would impinge upon a serious national matter.

On the other hand, if sovereign immunity is found, appellants' injury is not severe. Appellants do not deny that they could have sued for just compensation under the Tucker Act, 28 U.S.C. § 1346(a)(2).[6] In fact, one

5. Given our conclusion *infra*, we do not determine if appellees' conduct violated this statute.

6. Appellants contend that the statute of limitations would now bar them from filing a Tucker Act claim in the Court of Claims. We do not

believe that appellants' failure to pursue in a timely manner their proper legal remedies warrants a different conclusion. To find an exception because of the passing of the limitations period would be to reward appellants for their slothfulness. This result is reinforced because

appellant has in the past received compensation for an avigation easement resulting from Luke activities. *Tal Wi-Wi Ranchers,* 156 Ct.Cl. 700 (1962).

We conclude that the exception to sovereign immunity provided by *State of Washington v. Udall* does not apply to the present case.[7] Accordingly, the district court properly dismissed count II of appellants' complaint.

### B. *Transfer to the Court of Claims*

■ Appellants asked the district court to transfer their claim to the Court of Claims under 28 U.S.C. § 1406(c). This request came about nine months after count II was dismissed. The district court refused to transfer the cause. Appellants now contend that transferring is necessary so that they can avoid the statute of limitations which would otherwise bar a new action in the Court of Claims.

Transfer to the Court of Claims rests within the sound discretion of the district court. *See Sherar v. Harless,* 561 F.2d 791, 795 n.10 (9th Cir. 1977). Though the district court should carefully consider the effect of the statute of limitations, *id.* at 794, in view of the passing of nine months we do not believe the district court abused its discretion. *See id.*

### IV. *Count IV: FAA Control Over Military Noise Pollution*

Count IV alleged that under the Federal Aviation Act of 1958, as amended by the Noise Control Act of 1972, the Secretary of Transportation (Secretary) and the Administrator of the Federal Aviation Administration (Administrator and FAA) had a non-discretionary duty to regulate the use of airspace by military aircraft so as to control noise pollution and safety hazards. Claiming that the Secretary and Administrator had not performed this duty, appellants prayed that the court order them to issue regulations controlling military air-

craft noise. The district court granted the Government's motion for summary judgment on the ground that FAA jurisdiction over military aircraft is limited to air traffic control and does not encompass regulation of military aircraft noise.

On appeal appellants now claim that two statutory provisions confer jurisdiction upon the FAA to regulate military aircraft noise: § 611 of the Federal Aviation Act as amended, 49 U.S.C. § 1431, and § 307 of the Act, 49 U.S.C. § 1348.

### A. *49 U.S.C. § 1431*

Section 1431(b)(1) provides in part:

In order to afford present and future relief and protection to the public . . . from aircraft noise and sonic boom, the FAA . . . shall prescribe . . . such regulations as the FAA may find necessary to provide for the control and abatement of aircraft noise and sonic boom . . . .

Noting the great congressional concern with noise pollution that led to the Noise Control Act of 1972, of which this provision is a part, appellants contend that § 1431(b)(1) grants the FAA jurisdiction to control military aircraft noise.

Although § 1431(b)(1) does not on its face expressly exclude FAA control over military aircraft noise, it must be so read. First, the legislative history of § 1431(b)(1) indicates that Congress intended to deal with noise from civilian and not military aircraft. *See, e. g.,* S.Rep.No.1160, 92 Cong., 2d Sess., *reprinted in* [1972] U.S. Code, Cong. & Admin.News 4655, 4661–63, 4668 (report on Noise Control Act of 1972); S.Rep.No.1353, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code, Cong. & Admin.News 2688, 2692 (report on Aircraft Noise Abatement amendments to Federal Aviation Act of 1958).

Second, Congress placed § 1431 in Title VI of the Federal Aviation Act of 1958 as

---

appellants were also dilatory in pursuing another possible avenue of recovery of monetary damages: transfer to the Court of Claims. *See* part IIIB *infra.*

7. Having so determined, we do not address the Government's contentions that appellants would in any event not be entitled to injunctive and declaratory relief.

amended, cognizant that Title VI, entitled "Safety Regulation of Civil Aeronautics," authorizes FAA control only over civilian aircraft. The Aircraft Noise Abatement amendments of 1968 added § 1431 to the Federal Aviation Act of 1958. P.L. No. 90–411, § 1, 82 Stat. 395. The Senate Report on these amendments noted:

> Title VI of the Federal Aviation Act, within the framework of which this legislation will operate, applies only to civil aircraft, excluding thereby U. S. military aircraft. FAA issues no certificates for aircraft operated by the military departments. The committee believes that the division between military and civil aircraft should be preserved with respect to noise standards.

S.Rep.No.1353, at 2692. Later the Noise Control Act of 1972 provisions dealing with aircraft noise pollution were enacted as amendments to § 1431, still a part of Title VI. P.L. No. 92–574, § 7(b), 86 Stat. 1239–41. By contrast, when Congress wished to extend FAA *air traffic control* to military aircraft, it moved the statutory provision authorizing FAA air traffic control from Title VI to a different title of the Act applicable to both civil and military aircraft. H.Rep.No.2360, 85th Cong., 2d Sess., *reprinted in* [1958] U.S.Code Cong. & Admin.News 3741, 3756.[8]

> Finally, this court has recently written: [T]hough the courts remain the final interpreters of an act of Congress [citations omitted], the courts have also repeatedly recognized that an administrative agency's reasonable interpretation of the statute it administers is deserving of considerable respect. [Citations omitted.]

*Smith v. Califano,* 597 F.2d 152, 156 (9th Cir. 1979). In the instant case the Secretary and Administrator have consistently not applied § 1431(b)(1) to military aircraft noise. "We are thus most reluctant to disregard the Secretary's interpretation." *Id.* at 156–57.

We conclude, therefore, that § 1431(b)(1) does not authorize the FAA to control noise pollution resulting from military aircraft flights from Luke.[9]

**B.** *49 U.S.C. § 1348(c)*

Section 1348(c) provides:

> The Administrator is further authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft, for the navigation, protection, and identification of aircraft, for the protection of persons and property on the ground, and for the efficient utilization of the navigable airspace, including rules as to safe altitudes of flight and rules for the prevention of collision between aircraft, between aircraft and land and water vehicles, and between aircraft and airborne objects.

Noting that the Government agrees that this provision, not in Title VI, applies to both military and civilian aircraft,[10] appellants claim that it authorizes and directs the FAA to control noise pollution from military aircraft.

---

**8.** Congress noted of Title VI:

The authority of the Administrator under this title with respect to prescribing minimum rules and regulations and standards of safety is expressly limited to civil aircraft. For this reason, section 601(a)(7) of existing law (relating to the authority of the Administrator to prescribe air-traffic rules) has been omitted from this title and such authority is now contained in section 307(c) of title III . . . and applies to both civil and military aircraft. H.Rep.No.2360, 85th Cong., 2d Sess., *reprinted in* [1958] U.S.Code, Cong. & Admin.News 3741, 3756. For a fuller discussion of the Administrator's control over air-traffic rules, see part IVB *infra.*

**9.** Appellants contend that § 1431 must be read to apply to military aircraft or its reference to "sonic boom" would be meaningless. They argue that when this sonic boom language was written, only military aircraft could produce sonic booms and therefore Congress must have meant to control military sonic booms.

Section 1431(b)(1) speaks of "present and future relief and protection . . . from aircraft noise and sonic boom." Though at the time of passage there may not have been any sonic booms from civilian aircraft, Congress could reasonably foresee development of such civilian aircraft. The propriety of this reading is indicated by the legislative history's reference to "civil aircraft sonic boom." S.Rep.No. 1160, at 4668.

**10.** *See* p. 1221 *supra.*

Subsection (c) does not mention noise pollution. Labelled "Air traffic rules" and appearing in a section entitled "Airspace control and facilities," the language of the subsection appears to deal with air traffic control in the sense of directing the flow of air traffic. *See United States v. Christensen*, 419 F.2d 1401, 1403–04 (9th Cir. 1969).[11]

Moreover, the legislative history of this provision indicates that it was enacted, not to deal with noise pollution, but rather in response to "a series of 'fatal air crashes between civil and military aircraft operating under separate flight rules.'" *Id.* at 1404, *quoting* H.Rep.No.2360, at 3742. The subsection was thus directed at locating within the Federal Aviation Agency the "authority to regulate the use of all airspace over the United States by both civil and military aircraft, and to establish and operate a unified system of air-traffic control." H.Rep.No.2360, at 3745.

Finally, Congress placed the 1972 provision dealing explicitly with noise pollution in § 1431, even though, as part of Title VI, § 1431 applies only to nonmilitary aircraft. *See* part IVA *supra.* It would be inconsistent to say that § 1348(c), enacted in 1958, was meant to deal with noise pollution from military aircraft when Congress placed the provisions of the Noise Control Act of 1972 dealing with aircraft noise in a section and title applicable only to nonmilitary aircraft.

### C. Conclusion

Neither § 1431(b)(2) nor § 1348(c) grants the FAA authority to control noise pollution from military aircraft. *A fortiori* these provisions do not confer a non-discretionary duty upon the Secretary or Administrator to issue regulations dealing with noise pollution from military aircraft using Luke. Because as a matter of law the Government

was entitled to prevail on this claim, the district court properly granted summary judgment in favor of appellees. See *Loya v. Immigration & Naturalization Service*, 583 F.2d 1110, 1113–14 (9th Cir. 1978).[12]

### V. Count VI: Environmental Impact Statement and German Training

Count VI alleged that a 1971 agreement between the United States Government and the Federal Republic of Germany for training of German air force pilots at Luke constituted a "major federal action significantly affecting the quality of the human environment" and that therefore an EIS had to be prepared. See NEPA § 102, 42 U.S.C. § 4332. Because none was prepared, appellants asked the district court to enjoin the training until preparation of an EIS. The district court granted the Government's motion for summary judgment on the ground that the 1971 agreement was not a "major federal action significantly affecting" the environment.

### A. Government's Motion for Summary Judgment

The parties agree that an EIS is required only for "legislation and other major Federal actions significantly affecting the quality of the human environment." NEPA § 102(2)(C), 49 U.S.C. § 4332(2)(C); *see* Conf.Rep.No.765, 91st Cong., 2d Sess., *reprinted in* [1969] U.S.Code Cong. & Admin. News 2767, 2769; *Port of Astoria, Oregon v. Hodel,* 595 F.2d 467, 476 (9th Cir. 1979).

In the district court the Government supported its motion for summary judgment with extensive papers and affidavits. The Government summarized its supporting papers:

---

**11.** This court has recently noted: "The language of a statute is the best and most reliable index of its meaning, and where the language is clear and unequivocal it is determinative of its construction." *Smith v. Califano,* 597 F. 2d 152, 155 (9th Cir. 1979), *quoting Monte Vista Lodge v. Guardian Life Ins. Co.,* 384 F.2d 126, 128 (9th Cir. 1967), *cert. denied,* 390 U.S. 950, 88 S.Ct. 1041, 19 L.Ed.2d 1142 (1968).

**12.** We thus do not determine whether the district court could have ordered the Secretary and Administrator to promulgate regulations had it found a non-discretionary duty to do so. *Compare Rockbridge v. Lincoln,* 449 F.2d 567 (9th Cir. 1971) *with Corace v. Butterfield,* 387 F.Supp. 446 (E.D.N.Y.1975).

The decision to train German pilots in the F–104 at Luke AFB was made prior [to the effective date of the NEPA, January 1, 1970]. That this decision was final is demonstrated by the fact that the training has remained at Luke AFB for its entire duration of over ten years, with only minor alterations having been made in certain areas of emphasis.

The Government continued:

[T]he training of German F–104 pilots at Luke has remained essentially the same since the beginning of training in 1964 except for the fact that since 1974 the F–104 operations at Luke have been decreasing [and will end in fiscal 1982]. The 1971 agreement was not meant to, and did not result in, any change in the operations of the F–104 at Luke AFB. Since the agreement did not cause any change in the F–104 operations at Luke, it is clear that the "quality of the human environment in the vicinity of Luke AFB" was not affected by the decision to enter into the agreement.

Finally, the Government's papers established that the 1971 agreement between the United States and Germany "was merely a formalization of the understanding that had previously evolved between [the countries]."

Standing on their prior papers, appellants did not file affidavits in opposition to those filed by the Government. Rule 56(e) of the Federal Rules of Civil Procedure provides in part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his *response*, by affidavits or as otherwise provided in this rule, *must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.*

(Emphasis added.) This court has read this provision as meaning that if facts stated in the supporting papers of the movant are not contradicted by facts stated in the supporting papers of the opponent of the summary judgment motion, then the facts so stated in the movant's papers are taken as true for purposes of determining the propriety of summary judgment. *Jones v. Halekulani Hotel, Inc.*, 557 F.2d 1308, 1310 (9th Cir. 1977).

Because appellants did not "set forth specific facts showing that there is a genuine issue for trial," the facts set forth in the Government's supporting papers are uncontroverted and must be taken as true. The remaining question is whether, accepting those facts as true, the Government is entitled to prevail.

B. *Effect of NEPA on On-going Projects*

The effective date of NEPA was January 1, 1970. As a general matter, NEPA was not to be given retroactive effect. *See San Francisco Tomorrow v. Romney*, 472 F.2d 1021, 1024 (9th Cir. 1973). In the present case the Government's uncontroverted papers establish that the decision to train German pilots at Luke was made long before 1970. The papers also establish that training of German pilots began long before 1970. The critical question is whether the formalization of the German-American training program through the 1971 diplomatic agreement constituted a "major federal action" affecting the environment in view of the prior decision and training activities.

In some cases this court has found that a project, begun prior to the effective date of NEPA, had progressed so far that what remained could not be considered a "major federal action." In other cases, this court has found that federal participation in completing a project begun before the effective date but not completed by that date was substantial enough to constitute a "major federal action" requiring an EIS. *See Cady v. Morton*, 527 F.2d 786, 794 n.6 (9th Cir. 1975). As we wrote in *San Francisco Tomorrow*:

The controlling question . . . is whether or not subsequent to January 1, 1970, some further major action which would significantly affect the quality of the human environment, was required of the Federal Government . . . .

472 F.2d at 1024; *see Port of Astoria,* 595 F.2d 477.

Although such a determination will, of necessity, depend heavily upon the unique factual circumstances of each case, prior decisions suggest that here there was no further major federal action. In *San Francisco Tomorrow* we rejected the claim that amendatory contracts to an otherwise completed project constituted a major federal action:

> Amendatory contracts which increase the federal funding only to provide for the rising costs . . . do not constitute "further major federal action" within the meaning of the Act. Instead, such amendments represent but confirmation of the Federal Government's earlier decision . . . .

*Id.* at 1025. Similarly, in *Robinswood Community Club v. Volpe,* 506 F.2d 1366 (9th Cir. 1974), we wrote in relation to the application of NEPA to a highway project:

> Once the engineering design stage is finalized, the plan, the implementation of which results in an impact on the environment, has been completed. Each house that is moved, each mound of dirt that is excavated, each ribbon of concrete that is laid has an impact on the environment, but that impact is determined by the plan already adopted. Of course, the government will have substantial participation in the project subsequent to January 1, 1970. But mere participation is not enough. The real question is whether the government's continued participation constitutes "*further* major Federal ac-

tions having a significant effect on the environment . . . ." 36 Fed.Reg. 7727 (1971) (emphasis added). After final design approval, nothing *further* occurs which (1) is major and (2) has a significant effect on the environment other than what is contemplated by the approved design.

*Id.* at 1370.

In the present case the United States and Germany approved the "design" of the German training long before the effective date of NEPA. The pollution resulting from the German training is "what is contemplated by the" understanding to train. That the understanding was formalized by the 1971 agreement did not affect the pollution produced by the training; the 1971 agreement was "but confirmation of the Federal Government's earlier decision . . . ." *San Francisco Tomorrow,* 472 F.2d at 1025.

Indeed, ours is a more compelling case in which to find no major federal action than *Robinswood Community Club* or *San Francisco Tomorrow.* While *Robinswood Community Club* intimates that approval of the design suffices to avoid further major federal action, in the present case a large portion of the implementation of that design— the training of the German pilots—has already taken place, and in the same manner as the future training of German pilots; in fact, the Government's uncontroverted papers indicate that the total number of training flights is decreasing. And while *San Francisco Tomorrow* stated that an amendatory contract did not constitute a major federal action, here the Government's papers established that the 1971 agreement did not significantly amend the understanding between Germany and the United States, but rather "confirmed" the pre-existing understanding.[13]

---

13. Appellants again rely upon *Virginians for Dulles v. Volpe,* 541 F.2d 442 (4th Cir. 1976). The Fourth Circuit wrote:

> [T]he FAA's acquiescence in the vastly expanded use of the airports requires an impact statement. [Citation omitted.] This in-

creased use will have a significant impact on the environment . . . . The object of the Act is to require agencies to consider environmental values when making decisions. [Citations omitted.] This purpose would be largely defeated if the Act did not cover agen-

We conclude, then, that given the uncontroverted facts presented by the Government's papers, the 1971 agreement did not constitute a "major federal action" requiring promulgation of an EIS. Because the Government was entitled to prevail as a matter of law, the district court's granting of summary judgment in favor of the Government was proper. *See* Fed.R.Civ.P. 56(c), (e); *Loya,* 583 F.2d at 1113–14.

## VI. *Conclusion*

Having determined that the district court properly rejected appellants' claims, the judgment of the district court is

AFFIRMED.

cy activities which began before 1970 and go on indefinitely.
*Id.* at 445.

The facts relied upon by the Fourth Circuit indicate that its decision is not applicable here. Immediately before the paragraph quoted above (the paragraph quoted by appellants), the Fourth Circuit wrote:

> The facts stipulated by the parties . . . demonstrate that the FAA's activities do fall within the scope of § 4332(2)(C). These facts show that the population near the airports is growing and that the number of aircraft operations and passengers has steadily increased through the years. Moreover, the FAA forecasts that passengers will increase in number from 10,300,000 in 1972 to 16,000,000 in 1980 at National and from 2,465,000 to 7,658,000 at Dulles. The parties also stipulated that in 1972 the FAA included $26,000,000 in its budget request as the federal government's

share of "a major modernization of National."
*Id.* The Fourth Circuit viewed the FAA's continued acquiescence in this growth and the 1972 request for funds as constituting major federal action, notwithstanding the fact that the airports began operations (to a lesser degree) before 1970.

In our case, however, the only federal decision was made long before 1970; there is no decision akin to the FAA's acquiescence in the continued growth between 1972 and 1980 and the 1972 request for funds. Moreover, the Government's papers established that the number of training flights after 1970 would be equal to or less than the number undertaken before 1970, unlike the significant increase in the operations at National and Dulles airports. Thus, the Fourth Circuit's decision does not indicate that an EIS would be required under the circumstances of our case.